James Terry ROACH, Appellant,

v.

Warden Joseph MARTIN, Central Correctional Institution Columbia, South Carolina,

and

T. Travis Medlock, Attorney General for South Carolina, Appellees.

No. 84–4003.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 7, 1985.

Decided March 20, 1985.

J. Michael Farrell, Columbia, S.C., O. Grady Query, Charleston, S.C. (John K. Grisso, Columbia, S.C., on brief), for appellant.

Donald J. Zelenka, Chief Deputy Atty. Gen., Columbia, S.C. (T. Travis Medlock, Atty. Gen., Columbia, S.C., on brief), for appellees.

Before WIDENER, ERVIN and SNEEDEN, Circuit Judges.

WIDENER, Circuit Judge:

Petitioner James Terry Roach appeals the denial of his petition for writ of habeas corpus brought under 28 U.S.C. § 2254. We find that Roach's contentions are without merit and, accordingly, affirm the district court's denial of the petition and grant of summary judgment in favor of the South Carolina authorities.

## BACKGROUND

On December 13, 1977, Roach pleaded guilty as a principal to two counts of murder, criminal sexual conduct, armed robbery, and kidnapping. Roach also pleaded *nolo contendre* to two counts of conspiracy. On December 14, 15, and 16, 1977, the court, sitting without a jury in accordance with the provisions of S.C.Code § 16–3–20(B),[1] conducted a sentencing hearing for Roach and co-defendant Joseph Carl Shaw.[2] The record shows that Roach,

---

1. S.C.Code § 16–3–20(B) provides in part:

Upon conviction or adjudication of guilt of a defendant of murder, the court shall conduct a separate sentencing hearing to determine whether the defendant should be sentenced to death or life imprisonment. The proceeding shall be conducted by the trial judge before the trial jury as soon as practicable after the lapse of twenty-four hours unless waived by the defendant. If the trial jury has been waived by the defendant and the State, or if the defendant pleaded guilty, the sentencing proceeding shall be conducted before the court.

2. Shaw also pleaded guilty as a principal to two charges of murder, as well as pleading guilty to two charges of conspiracy, to armed robbery,

kidnapping, and criminal sexual conduct. *State v. Shaw,* 273 S.C. 194, 255 S.E.2d 799 (1979), cert. denied, 444 U.S. 1026, 100 S.Ct. 690, 62 L.Ed.2d 660, reh. denied, 444 U.S. 1104, 100 S.Ct. 1073, 62 L.Ed.2d 791 (1980). The sentencing judge imposed the death penalty on Shaw, and, on direct review, the South Carolina Supreme Court affirmed the convictions and sentences. 255 S.E.2d at 806–07. After unsuccessfully pursuing state post-conviction relief, Shaw sought federal post-conviction relief. We denied Shaw's petition for habeas corpus relief in *Shaw v. Martin,* 733 F.2d 304 (4th Cir.1984), cert. denied, — U.S. —, 105 S.Ct. 230, 83 L.Ed.2d 159, reh. denied, — U.S. —, 105 S.Ct. 555, 83 L.Ed.2d 441 (1984).

Shaw, and Ronald Eugene Mahaffey spent the morning of October 29, 1977 drinking beer and taking drugs.[3] In the early afternoon, Roach, Shaw and Mahaffey decided to, in the words of Mahaffey, "find a girl to rape." The three drove to a baseball park outside of Columbia, South Carolina, where they saw a parked car occupied by 17-year old Thomas Taylor and 14-year old Carlotta Hartness. Shaw pulled up beside the parked car, and Roach, sitting in the front passenger seat of Shaw's car, aimed a .22 caliber rifle at Taylor and demanded money. Taylor gave them his wallet. Shaw and Mahaffey got out of Shaw's car. Mahaffey took the keys to Taylor's car, and Shaw forced Miss Hartness to get into the backseat of Shaw's car with Mahaffey. Shaw then got back into his car and said to Roach, "OK, Now." Roach then fired the rifle into the parked car and killed Taylor.

The three drove Miss Hartness to a dirt road a short distance away, and she was forced to disrobe. She was repeatedly raped by all three and was forced to perform oral sex with Shaw and Mahaffey. While Shaw was raping the girl, Roach and Mahaffey looked through Taylor's wallet. The stolen wallet was later buried in the area. Shaw asked who would shoot the girl and Roach volunteered. Shaw ordered the girl to put her face to the ground but she refused. After pleading for her life several times, Miss Hartness finally complied and put her face to the ground. Roach then shot her in the head several times, causing her body to convulse.[4] Shaw took the rifle from Roach and again shot the girl in the head. The three then disposed of the rifle and bullets and re-

turned to Taylor's body to make sure he was dead.

Several days later, Roach, Shaw, and Mahaffey were arrested. The State of South Carolina elected to seek the death penalty against Roach and Shaw. As stated, because Roach pleaded guilty, the sentencing hearing was conducted before the court. S.C.Code § 16–3–20(B). As required by S.C.Code § 16–3–20(C), the sentencing judge considered evidence in mitigation and aggravation and, accordingly, made findings based on such evidence. In considering Roach's sentence, the sentencing judge found beyond a reasonable doubt the existence of three statutory aggravating circumstances: murder committed while in the commission of rape; murder committed while in the commission of kidnapping; and murder committed while in the commission of armed robbery. S.C.Code § 16–3–20(C)(a)(1)(a), (c), (e). After considering the evidence in mitigation for Roach, the judge found the existence of several statutory mitigating circumstances: Roach had no significant history of prior criminal activity involving the use of violence against another person; the murder was committed while he was under the influence of extreme mental or emotional disturbance; he acted under duress or under the domination of another person; his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. S.C. Code § 16–3–20(C)(b)(1), (2), (5), (6). Additionally, relating to mitigating circumstances, the sentencing judge considered that Roach was suffering from mental retarda-

---

**3.** Mahaffey was also a participant with Roach and Shaw in the criminal conduct of October 29, 1977. Pursuant to a plea bargain with the State, Mahaffey testified against Roach and Shaw in exchange for the State's promise not to seek the death penalty against him.

**4.** Roach now maintains that he did not shoot either victim, presumably for the purpose of supporting his claim that it would be disproportionate to impose the death sentence on a nontriggerman under *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). He relies on his statement to Lt. Walter Powell of the State Law Enforcement Division (SLED), in

which he admitted to having been present at the time of the crimes but denied either raping Miss Hartness or shooting either victim. Mahaffey's testimony that Roach shot both victims and raped Miss Hartness, however, is consistent with the version of the criminal episode Roach related to a friend of Shaw's, Robert Williams, on the evening of the murders. Williams testified at the hearing as to what Roach had told him about the murders and, consistent with Mahaffey's version, stated that Roach admitted to having shot both victims and having raped the girl.

tion and an antisocial personality disorder and was below the age of 18 at the time of the crime. S.C.Code § 16–3–20(C)(b)(7), (9). Considering the circumstances in mitigation as well as the existence of the three statutory aggravating circumstances, the sentencing judge found as an affirmative fact that the evidence in the case warranted imposition of the death penalty upon Roach and was not the result of prejudice, passion or any other arbitrary factor. S.C. Code § 16–3–20(C). The judge sentenced Roach to death on the two murder charges.[5]

On direct appeal to the South Carolina Supreme Court, Roach's convictions and sentences were affirmed. *State v. (Roach), Shaw,* 273 S.C. 194, 255 S.E.2d 799 (1979). The United States Supreme Court denied Roach's petition for certiorari, 444 U.S. 1026 (1980), and later denied his petition for rehearing, 444 U.S. 1104 (1980). Roach then sought post-conviction relief in the state courts pursuant to S.C.Code § 17–27–10 *et seq.* The state post-conviction court conducted a comprehensive evidentiary hearing and denied Roach's petition by order of July 9, 1980. Roach thereafter appealed this denial to the South Carolina Supreme Court, which dismissed the appeal, finding no error of law present. *Roach v. State,* Memo.Op. No. 81–MO–197 (S.C. July 17, 1981). Thereafter, the South Carolina Supreme Court denied Roach's motion for a stay of execution and the date of execution was set for September 18, 1981.

Having exhausted his state court remedies, Roach filed his petition for federal habeas corpus relief. On September 4, 1981, the district court granted Roach's petition for a stay of execution pending resolution of the issues stated in the petition. Proceedings in Roach's federal habeas corpus petition were stayed, however, while Roach again sought direct review by the United States Supreme Court. When that Court again denied Roach's petition

for certiorari on January 25, 1982, that stay of proceedings was dissolved. The case was referred to a United States Magistrate to review the pleadings and submit findings of fact and recommendations of disposition. Accordingly, the magistrate submitted his report recommending the entry of summary judgment in favor of respondents without an evidentiary hearing. The district court agreed that Roach's federal constitutional claims were without merit and granted the State's motion for summary judgment, from which Roach now appeals. While, for the most part, we consider Roach's contentions in the order in which he has submitted the issues in his brief, a few of the issues have been consolidated for discussion.

## I. DISCOVERY REQUESTS AND REQUEST FOR AN EVIDENTIARY HEARING

■ Roach alleged that an evidentiary hearing was mandatory under *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), and 28 U.S.C. § 2254(d). He asserts that a fair and adequate hearing was not held on any of his claims in the state courts and, in this respect, he has made several requests for discovery, appointments of experts, and appointments of investigators for the purpose of developing his constitutional claims. On federal habeas corpus review, a state court's findings of fact are entitled to presumption of correctness, *Sumner v. Mata,* 449 U.S. 539, 550, 101 S.Ct. 764, 770, 66 L.Ed.2d 722 (1981), unless a petitioner can show that an evidentiary hearing on an issue of fact is mandatory under the criteria established in 28 U.S.C. § 2254(d) or in *Townsend v. Sain, supra.*

Roach alleges that he meets several of these criteria for numerous reasons: (1) the state factfinding procedures were not adequate to afford a full and fair hearing on Roach's constitutional claims, *see* 28

5. Roach received a sentence of 30 years' imprisonment on the criminal sexual conduct charge; a sentence of 5 years' imprisonment on each of the conspiracy charges; a sentence of 25 years' imprisonment on the armed robbery charge; and no sentence for the kidnapping charge. Each sentence imposed was to run consecutive to all other sentences.

U.S.C. § 2254(d)(2); (2) since the state court hearing was held, Roach has discovered, and now relies upon, substantial new evidence, *see Townsend,* 372 U.S. at 313, 83 S.Ct. at 757: (3) material facts were not adequately developed at the state court hearing, *see* 28 U.S.C. § 2254(d)(3); and (4) the state court's factual determinations are not supported by the record as a whole, *see Townsend,* 372 U.S. at 313, 83 S.Ct. at 757.[6] We do not agree with any of the arguments Roach advances.

### A. *Adequacy of the State factfinding procedures*

■ Roach contends that the state factfinding procedures were inadequate in several respects and that, as a result, he was denied the opportunity to develop fully his constitutional claims in the state courts. In this regard, Roach claims that: the State did not, or could not, locate a material witness who might have been able to shed light on the possibility that Roach was psychotic at the time of the offenses; the state post-conviction court did not appoint an expert social scientist to testify concerning the propriety of the death penalty; the neurological examination of Roach by a physician employed by the State failed to adequately develop neuropsychiatric facts relevant to Roach's constitutional claims; the state court improperly quashed a subpoena issued by Roach to depose a former Chief Staff Attorney for the South Carolina Supreme Court and thus Roach was unable to ascertain the procedure by which the South Carolina Supreme Court conducted its proportionality review; and the state post-conviction court did not produce the transcript of the record concerning the disbarment of lead counsel Walter Brooks even though the court considered such record in reaching a factual determination.[7]

In support of a theory that it would be disproportionate to impose the death penalty upon Roach because he suffered from involuntary drug-induced psychosis at the time of the offenses,[8] discussed in Part III, B, *infra,* Roach has requested the appointment of an investigator to locate one Medders so that Roach may depose Medders to ascertain the identity of the drug Medders allegedly injected into Roach on the day of the offenses. The evidence produced at the sentencing hearing through Roach's psychiatric examiner, Dr. Edmond Camp, III, indicated that Roach told him that on the date of the murders he had consumed a lot of beer, smoked a lot of marijuana, and had injected a substance called "Diamond Crystal THC" into his veins. Dr. Camp further testified that THC was an hallucinogenic drug and that, according to Roach, Roach was in a psychotic state after he had injected the drug. Dr. Camp's identification of the drug Roach used was on the

---

**6.** Roach also asserts in his brief that he is entitled to an evidentiary hearing on the ground that "[a]lthough the State Court made a [sic] express finding of fact, it did so, in the context of applying an erroneous legal standard." We have not discussed this issue specifically in the text of the opinion since Roach's brief did not identify which legal standard was erroneous nor did it indicate which factfinding was thereby affected. We can only assume that Roach requests an evidentiary hearing on this basis to redevelop his constitutional claims that the state courts found were without merit.

**7.** Roach has made several other discovery requests to support his claim that he did not receive a full and fair hearing in the state courts for the development of his constitutional claims. For the reasons stated by the district court, deposition of one Dr. Camp would not enhance Roach's claim for relief. The district court properly denied the request to depose Dr. Camp, whose trial testimony Roach claims was per-

jured and materially inaccurate. As the district court found, Dr. Camp's testimony did not deny Roach a fair trial because the sentencing judge actually found several mitigating circumstances based on his testimony and in no way questioned the credentials of Dr. Camp. The district court also denied Roach's request to depose Carter to elicit testimony that when Shaw shared a cell with Carter, Shaw told Carter that he (Shaw) had killed both Taylor and Hartness. The court reasoned that such proffered testimony, standing alone, would be insufficient to warrant further inquiry. In any event, the record contains nothing more than the bare allegation of what Carter's testimony would be. See also note 19, *infra.*

**8.** Roach also claims the need to depose Medders on the theory that counsel was ineffective in failing to develop a defense or case in mitigation based on drug-induced psychosis, discussed in Part II, A, *infra.*

basis of Roach's discussions with Dr. Camp.[9]

■ Contrary to anything that was produced at trial, however, Roach now maintains that he was under the influence of phencycodine (PCP) at the time of the murders, and he claims that the development of this fact might tend to support either an insanity defense or a case in mitigation based on diminished capacity.[10] Roach also seeks to depose a biochemical scientist, Dr. Candace Pert of the National Institute of Mental Health, who would testify that PCP induces symptoms indistinguishable from paranoid schizophrenia. We do not think that the requested and anticipated testimony would enhance the state court's fact-finding procedures nor would it enhance development of Roach's constitutional claims. The plain fact is that the sentencing judge was well aware of the testimony that Roach was under the influence of some type of drug, of which he took note. He apparently attached significance to such evidence by finding in mitigation that Roach's capacity to conform his conduct to the requirements of the law was substantially impaired and that the crimes were committed while Roach was under the influence of extreme mental or emotional disturbance. Moreover, even if the injected drug was in fact PCP and not Crystal THC, THC being the active ingredient of marijuana, the mere relabeling of the drug would not support a different finding with respect to Roach's state of mind. The state court record clearly supports a finding that Roach vividly recalled the details of the murders and that he was able to distinguish between right and wrong. Thus, we find no merit in Roach's requests to develop new evidence concerning the name and general effects of the drug allegedly injected because we do not believe that this inquiry would enhance his constitutional claims of ineffective assistance of counsel and disproportionate application of the death penalty for the reasons we discuss in Part II and Part III, respectively.

■ Next, Roach seeks to retain Dr. Raymond Paternoster to give live testimony concerning his study of the application of the South Carolina Death Penalty Statute post-*Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). In effect, Roach claims that although Dr. Paternoster testified at the state post-conviction hearing, Roach, an indigent, was not able to adequately develop material facts concerning his claim of unconstitutional application of the death penalty statute because the State denied Roach's request to have Dr. Paternoster appointed at the State's expense to conduct a thorough study of the application of the death penalty under South Carolina's post-*Gregg* statute. We find that any failure to appoint Dr. Paternoster is meritless because Dr. Pasternoster did testify at the state post-conviction hearing at the expense of the State. So far as Dr. Paternoster's later findings are concerned, we have rejected his theory in *Briley v. Booker*, 746 F.2d 225 (4th Cir.1984).

■ Roach also asserts that he was denied a fair hearing because the State failed to appoint a neurologist, who was not an employee of the State, to conduct a neurological examination on Roach. As a result of this failure, Roach claims he was unable to develop neuropsychiatric facts relevant to his constitutional claims. We have considered the testimony of Dr. Charles N. Still, appointed by the court at the post-conviction hearing to conduct tests on Roach to determine whether Roach had manifested symptoms of the genetically-transmitted

---

9. We think it significant to note at this point that Roach consistently maintained to trial counsel that he had only smoked marijuana and drunk beer. Trial counsel became aware of the Crystal THC injection only after Roach had admitted that he was a triggerman in both murders. We also note that in the statement Roach gave to SLED he never mentioned drug use on the day of the murders.

10. Development of an underlying drug-induced psychosis defense is offered to support Roach's claim of ineffective assistance of counsel, discussed in Part II, A, *infra,* and the claim of disproportionate application of the death penalty, discussed in Part III, *infra.*

terminal brain deteriorating Huntington's Disease, and fail to see how the mere fact that Dr. Still was employed by the State operated to deny Roach a fair hearing. In fact, Dr. Still, an expert on Huntington's Disease (HD), corroborated and gave credibility to the testimony of Roach's examiner, Dr. Camp, at the sentencing hearing, as well as enlightening the court on the effects of the disease in general. We think the suggestion that Dr. Still, a known expert in the area of HD research, would somehow taint his medical diagnosis of Roach and testimony concerning the disease merely because he is employed by the State is entirely without evidence to support it and borders on frivolity.

Next, Roach claims that he was denied a fair hearing because the State quashed a subpoena directed by Roach to Mr. Clyde Davis, a former Chief Staff Attorney for the South Carolina Supreme Court. Roach maintains that he must be afforded the opportunity to depose Davis so that Roach can discover that court's procedure in conducting a proportionality of sentence review.[11] We agree with the district court that such an inquiry would thwart the confidentiality of that court's decision-making process. Furthermore, we do not think that the State's refusal to let Roach depose Davis has denied Roach a fair hearing, for in any event we think that the South Carolina Supreme Court conducted a meaningful review of the death sentence.

Finally, to support a claim of unconstitutional conflict of interest amounting to ineffective assistance of counsel, which we discuss in Part II, A, *infra*, Roach claims the need to depose the custodian of records of the Board of Commissioners on Grievances and Discipline for the South Carolina Bar. During the state post-conviction hearing, the judge refused to hear evidence concerning the disbarment of Roach's lead counsel, Walter Brooks, because the South

Carolina Supreme Court had not issued a formal opinion in the matter. After the South Carolina Supreme Court issued a formal opinion disbarring Brooks on May 6, 1980, *see In re Brooks*, 274 S.C. 601, 267 S.E.2d 74 (1980), cert. denied, 449 U.S. 984, 101 S.Ct. 401, 66 L.Ed.2d 246 (1980), the state post-conviction court subpoenaed the disbarment proceeding records. That court then studied the complete record of the proceeding against Brooks before reaching its decision and found, "there is nothing in that record which shows, nor indicates, any dereliction of duty [by Brooks in his representation of Roach], nor is there any credible evidence that shows Mr. Brooks to have failed to adequately and effectively represent his clients." Since Roach did not see the record of the disbarment proceeding at the time the state post-conviction court considered the matter, Roach yet claims the need to depose the custodian of the Grievance Committee records to determine whether the custodian holds any records in the matter that were not considered by the post-conviction court.

We see no merit to this argument. There is nothing to suggest that the Grievance Committee did not comply with the post-conviction court's subpoena and deliver the entire record of the disbarment proceeding to that court. We think the state post-conviction court, in a commendable exercise of caution, procured the record of the disbarment proceeding and considered it before arriving at its decision. Despite the fact that the record of the state disbarment proceeding has been public for months on end between May 6, 1980 and the date of the determination of this case both in the district court and here, there is no suggestion by Roach pointing to anything in the disbarment record which might affect his trial and sentence. Even in spite of this, the district court considered the record of the disbarment proceeding as did the state post-conviction court. Nothing shown or suggested to us here gives us

11. In this regard, Roach has also requested the appointment of a law professor, Dr. David Baldus, so that Dr. Baldus can review the deposition testimony of Davis and then testify within his expertise regarding the adequacy and fair-handedness of the South Carolina Supreme Court's appellate review. Such request was properly denied by the district court.

any pause in holding that the district court's and the state post-conviction court's findings were quite correct, and we so hold. See FRCP 52(a); 28 U.S.C. § 2254(d).

Accordingly, notwithstanding Roach's several arguments, we find that the factfinding procedure employed by the State afforded Roach a full and fair hearing.

### B. *Newly-discovered evidence*

Roach contends that since the time of the state post-conviction hearing he has discovered new evidence to support his constitutional claims and that he is therefore entitled to an evidentiary hearing. First Roach seeks to have Dr. Paternoster testify concerning a study Dr. Paternoster has performed since Roach's state hearing. The study indicates, the argument goes, that the South Carolina post-*Gregg* statute is applied disproportionately according to race. It would show that a murderer who has killed a white victim has a greater chance of having the death penalty imposed on him than one who has killed a black victim. We note that this is the same type of analysis that we rejected in *Briley v. Booker*, 746 F.2d 225 (4th Cir.1984), and we, in accordance with our reasoning in *Briley*, similarly reject the necessity of conducting an evidentiary hearing on the issue.[12]

Also for our consideration is Roach's assertion that there now exists a way to diagnose Huntington's Disease (HD) presymptomatically. HD is an inherited neuropsychiatric disorder which, upon manifestation, causes involuntary movements, emotional disturbance, intellectual impairment, and inevitably leads toward dementia and ultimate death.[13] Because HD is an autosomal dominant genetic disorder, each child of an affected parent has a 50% chance of inheriting the disease. It is generally accepted that the age of onset of HD occurs when an at-risk individual (one who has a parent with HD) reaches somewhere between the ages of 35 and 45 and that after onset the disease progresses for 10 to 20 years until the victim ultimately dies.[14]

Since Roach's mother has been diagnosed to have HD in an early stage, Roach has a 50% chance of also carrying the Huntington's gene. Roach was examined by Dr. Still by order of the state post-conviction court, and Dr. Still found that at that time he could not diagnose that Roach was suffering from HD. Dr. Still, however, further testified that he was unable to conclude to a medical certainty that Roach would not later manifest the disease since, at the time of the hearing, no accepted reliable presymptomatic test existed for detecting HD in at-risk individuals before onset of symptoms. Roach asserts that there now exists a method for presymptomatic detection of HD and accordingly has requested the appointment of Dr. Pert to testify as to the new method for early diagnosis of the disease.

Counsel for Roach definitively stated at oral argument that because of the technological breakthrough in neuroscience research, Positron Emission Tomography (PET Scan) now provides a. means by which HD may be detected before onset of symptoms. In this regard, Roach requests the appointment of Dr. Pert to elicit testimony concerning the PET Scan and its "diagnostic potential for the presymptomatic diagnosis of Huntington's Disease." At oral argument, counsel for Roach was asked by

12. We note in passing that, on a factual basis, in *Shaw v. Martin*, 733 F.2d 304 (4th Cir.1984), we rejected Shaw's claim which was based on an even later study by Dr. Paternoster than the study relied on here.

13. *See generally* F. Baro, *et al., Electromyography in Huntington's Disease*, 24 Electromyogr. Clin. Neurophysiol. 305 (1984); E. Caine, *et al., Huntington's Dementia*, 35 Arch.Gen. Psychiatry 377 (1978); R. Myers, *et al., Maternal Transmis-*sion in *Huntington's Disease*, Lancet 208 (Jan. 29, 1983).

14. *See generally* S. Folstein, *et al., Conduct disorder and affective disorder among the offspring of patients with Huntington's Disease*, 13 Psychological Medicine 45 (1983); S. Folstein, *et al., Psychiatric Features of Huntington's Disease: Recent Approaches and Findings*, 2 Psychiatric Developments 193 (1983); M. Pines, *In the Shadow of Huntington's*, Science 33 (May 1983).

the court to cite documentation which supported the assertion that the PET Scan now provides a reliable presymptomatic test. While counsel did not refer to any specific publication, he stated that the National Institute of Mental Health had recently issued a memorandum on the subject. Acknowledging that our facilities for medical research are quite limited, and our ability to interpret the material found as much so, we have discovered one reference to PET Scan. The reference appeared in an undated memorandum issued by the National Institute of Neurological and Communicative Disorders and Stroke (NINCDS), National Institutes of Health, which in pertinent part stated:

### HUNTINGTON'S DISEASE

\* \* \* \* \* \*

*PET RESEARCH.* An increasing number of grantees in the NINCDS positron emission tomography (PET) program are using PET to study the brains of HD patients. This brain imaging technique allows scientists to study the brain's metabolic activity in live patients. Research work on PET *offers hope* for the development of early diagnostic and therapeutic techniques for HD. (Emphasis added)

Of interest, we also found that pioneering activity in HD research and diagnosis has brought about a breakthrough in recombinant deoxyribonucleic acids (DNA) technology through which scientists have been able to isolate and locate the genetic marker linked to the HD gene.[15] As well, electromyography to identify decreasing motor control may offer hope of pre-clinical identification of the disease.[16]

 While counsel for Roach did not bring this other newly-discovered technology to our attention, our reading on the subject, limited as it must be, has only confirmed Dr. Still in his testimony that no technique is available at this time to diagnose HD presymptomatically. While we are aware that Roach would attempt to refute this finding by putting Dr. Pert on the stand, Roach has furnished us no basis to support his contention, and we have found no support on our own.

 In any event, even assuming arguendo that Roach does in fact have the Huntington's gene, in which case HD will inevitably manifest its symptoms, we can see no way that this fact alone would alter Roach's conviction and sentence. In other words, a determination today that Roach has the HD gene would not affect the findings that Roach was sane at the time of the offenses and that he was competent to stand trial, and is now competent. Thus, we are faced with the question of whether the presence of the HD gene, or even manifestation of the disease at this date, would preclude the imposition of the death sentence on the basis of the Eighth Amendment's prohibition against cruel and unusual punishment. We think such a result is not required by the Eighth Amendment. Although the historic standards of our society and some statutes may not permit the execution of an insane man, see *Solesbee v. Balkcom,* 339 U.S. 9, 70 S.Ct. 457, 94 L.Ed. 604 (1950); *Nobles v. Georgia,* 168 U.S. 398, 18 S.Ct. 87, 42 L.Ed. 515 (1887), Roach has presented no evidence to indicate that he is insane, and we have no reason to so surmise. Consequently, absent evidence of Roach's insanity, we do not think that a diagnosis of Roach as having the HD gene would affect the death sentence imposed.

---

**15.** Researchers have focused on many different methods for establishing a presymptomatic diagnostic technique for HD. Generally, such methods have included attempts to develop behavioral, biochemical, neurological, and genetic indices for presymptomatic diagnosis. *See generally* P. Fedio, *et al., Neuropsychological Profile of Huntington's Disease: Patients and Those at Risk,* 23 Advances in Neurology 239 (1979); H. Klawans, *et al., Presymptomatic and Early De-* *tection in Huntington's Disease,* 8 Annals of Neurology 343 (1980); Kolata, *Huntington's Disease Gene Located,* 222 Science 913, 914 (Nov. 25, 1983); *In the Shadow of Huntington's, supra,* note 14, at 32.

**16.** *Electromyography in Huntington's Disease, supra,* note 13.

We accordingly find that Roach is not entitled to an evidentiary hearing on the basis of newly-discovered evidence.

### C. *Material facts were not adequately developed in the state courts*

Essentially, the material facts that Roach claims were not adequately developed in the state courts are the same facts that formed the basis for Roach's assertion that the state factfinding procedures denied him a full and fair hearing on his constitutional claims. For the same reasons that we found in Part I, A, *supra,* that the state factfinding procedures were adequate with respect to the development of certain facts, we do not think that Roach was denied the opportunity to introduce material facts for the development of his constitutional claims. However, we have not considered previously Roach's assertion that he was unable to develop in the state courts material facts concerning the effects of HD.

At the sentencing phase, Dr. Camp, who at that time was the chief forensic psychiatrist for the State, testified on behalf of Roach. He testified that Roach was mentally retarded and that Roach could not be presently diagnosed as suffering from HD. On the basis of Dr. Camp's examination of Roach and testimony thereon, the sentencing judge found several mitigating circumstances.[17] At the state post-conviction hearing, however, counsel for Roach argued that Dr. Camp had exaggerated his professional publications and that he had testified inaccurately with respect to HD and that, as a result, Roach was prejudiced at the sentencing hearing. Accordingly, the state post-conviction court ordered Dr. Still to examine Roach and his family.[18] While Dr. Still's testimony regarding HD

was significantly more complete than Dr. Camp's testimony, Dr. Still confirmed Dr. Camp's finding that Roach could not be presently diagnosed as suffering from HD. Neither Dr. Camp nor Dr. Still was able to determine to a medical certainty whether Roach would ever suffer from HD.

Nevertheless, Roach asserts that material facts concerning HD were not developed at the sentencing phase because Dr. Camp was not familiar with the disease. Presumably, these nondeveloped facts are material to the extent that the sentencing judge was denied the opportunity to consider the possible effects HD might have had on Roach's behavior at the time of the crimes.

While we might easily dispose of this argument for the reason that Roach could not be diagnosed as having the Huntington's disease gene at the time of the offenses, or even as late as the post-conviction hearing, Dr. Still's testimony should be mentioned. He testified that prior to symptoms by means of which Huntington's disease may be diagnosed there are certain behavioral changes in those people who have the gene which probably precede those symptoms. They are: subtle mental changes which antedate the symptoms in most cases, and there may be significant effects on thought, memory and perception.

We believe that Dr. Still's testimony adequately developed material facts concerning HD. The state post-conviction court, keenly aware of its responsibility, carefully considered Dr. Still's testimony and found that from a medical diagnostic standpoint Dr. Still's and Dr. Camp's testimony was not materially different. Because we think that Dr. Still adequately

---

**17.** Mental retardation, antisocial personality disorder, extreme mental disturbance, and substantially impaired capacity.

**18.** Dr. Still was the treating physician for Roach's mother. He had graduated from Clemson (B.S. Chemistry), Purdue (M.S. Nutritional Biochemistry), and the Medical University of South Carolina (M.D.). He was licensed to practice in South Carolina, a Diplomat in Neurology of the American Board of Psychiatry and

Neurology. He has taught at Purdue, Clemson, and the U.S. Military Academy, and at the time of the hearing was the Chief of Neurology Service of William S. Hall Psychiatric Institute, and a Professor of Neuropsychiatry and Behavioral Science of the University of South Carolina School of Medicine in Columbia. He is one of forty members of the research group on Huntington's Chorea of the World Foundation of Neurology.

developed the facts with respect to HD, Roach is not entitled to an evidentiary hearing to explore the issue further.

### D. *The State court's factual findings are not supported by the record as a whole*

■ We have carefully considered the state court record and are convinced that the state court's factual determinations are fairly supported by the record as a whole. Since we find that the record fairly supports the factual determinations, a further evidentiary hearing in a federal court would not enhance the quality of justice rendered Roach in the state courts.

## II. VALIDITY OF THE GUILTY PLEAS AND SENTENCES

Roach next asserts that he is entitled to relief because his guilty pleas and sentences are invalid.

### A. *Ineffective Assistance of Counsel*

Roach claims that his guilty pleas were involuntary, and thus invalid, because he received ineffective assistance of counsel in deciding to enter the guilty pleas. In this connection, Roach also asserts several reasons in support of his argument that counsel was ineffective at the sentencing phase and thus the sentences are invalid. A third argument Roach advances in this area is that his pleas and sentences are invalid because he was represented by counsel with an alleged unconstitutional conflict of interest. We will consider these contentions in order.

■ Despite the possibility that in a bifurcated proceeding counsel may be ineffective at either phase, we will discuss Roach's ineffectiveness claims as they relate to both phases because Roach essentially has claimed that for many of the reasons counsel was deficient in preparing a defense in the guilt phase, counsel was similarly deficient in preparing a case in mitigation at the sentencing phase.[19] Roach's ineffective assistance of counsel claims were reviewed extensively by the state post-conviction court upon an evidentiary hearing, and by the district court below, and we have considered, upon our own review of the record, that Roach received effective assistance of counsel at both the guilt and sentencing phases.

■ *Strickland v. Washington,* —— U.S. ——, 104 S.Ct. at 2052, 80 L.Ed.2d 674 (1984), establishes the standard by which attorney performance is measured for the purpose of resolving ineffective assistance of counsel claims. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." 104 S.Ct. at 2063. The Court in *Strickland* emphasized that for purposes of evaluating attorney conduct, every effort must be made to view the conduct from counsel's perspective at the time. *Id.* at 2065. "Because of the difficulties inherent in making the valuation, a court must indulge a strong presumption that counsel's conduct falls within the range of reasonable professional assistance." *Id.* Fur-

---

**19.** We note two arguments that we have not addressed in the body of the opinion but which we will briefly mention here. First, Roach alleges that trial counsel was deficient in failing to interview Officer Cronise to ascertain the circumstances under which Roach gave an oral statement to the Officer upon arrest. The district court correctly found that trial counsel made an appropriate investigation based on information supplied by Roach concerning his statements to police and based on independent verification of Roach's story with Lt. Powell of SLED. Moreover, because the statement was never introduced into evidence, lack of prejudice as well as lack of merit of the claim is patent.

A second argument we think equally without merit is the claim that trial counsel failed to investigate an alleged statement given by Shaw to a cellmate, one Carter, that would have been exculpatory as to Roach. Carter was a potential State's witness whom the State did not call to testify because the credibility of another ex-Shaw cellmate was successfully attacked by Shaw's trial counsel. Roach alleges that "[a]ccording to the testimony of John McIntosh, Carter's testimony was essentially the same as Mr. Laroque's [whose testimony was that Shaw admitted to him entire responsibility for the shootings]." We have examined the testimony of McIntosh and find that it does not support the allegation. McIntosh testified that he did not know what Carter would testify to.

thermore, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance...." *Id.*

■ We think the district court correctly disposed of Roach's ineffective assistance claims after determining that trial counsel's actions were strategic choices based on informed, professional deliberation, and will not review each of those claims in detail here because, under *Strickland*, we should be extraordinarily slow to second-guess counsel's trial strategy. *Strickland*, p. 2065. Two of Roach's contentions in this respect, however, merit some discussion.

In essence, Roach has alleged that trial counsel failed to conduct an adequate factual investigation regarding the type of drug Roach had injected and that counsel failed to conduct an independent investigation of HD. As a result, Roach claims that counsel failed to develop a possible defense based on insanity or involuntary intoxication or drug use, and that counsel similarly failed to present such a case in mitigation.

Central to Roach's argument are the claims that had Roach's trial attorneys further investigated HD and had they discovered what drug Roach had injected, the attorneys would have been able to develop an insanity defense or an involuntary intoxication or drug use defense or case in mitigation.

■ We do not agree that counsel was deficient in failing to develop an insanity defense premised, as Roach now maintains, on an interlocking theory of insanity based on the presence of HD and drug-induced psychosis. Roach's claim assumes that Roach was in fact insane under the *M'Naughton* rule at the time of crimes because of the "presence of the mental disease Huntington's and ... drug-induced psychosis" and that counsel ignored this fact. We think such an assumption totally ignores the fact that trial counsel obtained Dr. Wayne Lockhart, a psychiatrist, of the State Hospital to perform a psychiatric examination on Roach and it was Dr. Lock-

hart's opinion that Roach was competent at the time of the offenses and was competent to stand trial. His testimony would have been less favorable to Roach than the physician who testified. Counsel for Roach made an informed decision based on Dr. Lockhart's findings that since Roach was not insane under *M'Naughton*, there would be no basis upon which to establish an insanity defense. Roach's present counsel maintains, in effect, that even though trial counsel obtained the psychiatric opinion that Roach was sane, they nevertheless had the duty to explore an insanity defense based on HD and drug-induced psychosis. Implicit in this argument is the fact that present counsel would have us hold that trial counsel had an affirmative duty to shop around for another psychiatrist who would have found Roach to be insane. We have previously excluded such claims, *see, e.g., Turner v. Bass*, 753 F.2d 342, 350 n. 7 (4th Cir.1985); *Barfield v. Harris*, 719 F.2d 58, 63 (4th Cir.1983), *aff'g*, 540 F.Supp. 451 (E.D.N.C.1983), and we do so here because we think counsel reasonably relied upon Dr. Lockhart's examination to conclude that no basis for an insanity defense existed.

■ Next, we consider whether trial counsel was deficient in failing to investigate and develop a defense based on involuntary intoxication. In this regard, present counsel claims that trial counsel was deficient in failing to investigate what type of drug Roach injected, and the effects that drug would have had on Roach, and counsel failed to investigate the possibility that HD would have caused Roach to abuse this substance involuntarily. Roach's present counsel argues that trial counsel failed to pursue a defense based on involuntary intoxication which would have satisfied *M'Naughton*. Roach's present counsel maintains that trial counsel should have investigated the possibility that Roach was in a drug-induced psychotic state caused by injecting PCP and that this drug injection was involuntary because substance abuse is an involuntary symptom of HD.

We reject such a contention because we think present counsel's argument is clearly a product of hindsight and fails to address the facts reasonably relied upon by counsel at the time. *See Strickland*, 104 S.Ct. at 2065. Furthermore, the record belies the argument. Evaluating trial counsel's conduct from counsel's perspective at the time, as *Strickland* requires us to do, we think counsel's failure to develop an involuntary intoxication defense was reasonable under the circumstances. Roach admitted to trial counsel that he (Roach) had been drinking beer and smoking marijuana on the day of the murders. Counsel specifically rejected a defense based on alcohol or drug abuse because Roach recalled the events of the murders "with such conciseness" that, consistent with Roach's admission that he only drank beer and smoked marijuana, made such a defense seem implausible. Accordingly, trial counsel rejected such a defense, and in preparing to present Roach's case to go before a jury, counsel made the informed strategic choice to portray Roach in a manner that would generate sympathy from the jury. More specifically, trial counsel intended to emphasize Roach's two mental deficiencies, mental retardation and antisocial personality disorder, and to make Mahaffey, who was guaranteed no more than a life sentence, appear the more culpable. In forming this defense and mitigation, trial counsel relied on the information supplied by Roach concerning the drug use. Since trial counsel was impressed with Roach's ability to recall the details of the murders, it was reasonable for counsel to rely on Roach's statement to them as to drug use in deciding not to investigate the drug use further. *See Strickland*, 104 S.Ct. at 2065.

■ Furthermore, we do not think that this decision not to investigate somehow became unreasonable after trial counsel finally became aware that Roach had a shot of a substance alleged to have been "Crystal THC." This conclusion requires a brief discussion of the circumstances surrounding the posture of Roach's case.

On Monday, December 12, Shaw and Mahaffey entered their guilty pleas. Roach and counsel were in the courtroom at this time and intended to go to trial on the issue of guilt. In fact, at this point, trial counsel had concentrated their efforts in preparing for jury voir dire. In any event, while Mahaffey was relating his story to the court, Roach, according to trial counsel, "broke down" and admitted to counsel that Mahaffey was telling the truth. It was at this time that counsel became aware that, contrary to Roach's previous assertions, Roach was the triggerman in both murders and that Roach had injected "Crystal THC" on the day of the murders. Viewing these inconsistent and devastating statements as trial counsel must have viewed them in the context of preparing to enter a not guilty plea and go to the jury on the theory that Roach was a mentally deficient nontriggerman, we think trial counsel aptly described his situation as being "on the hot seat" in the context of having to quickly reassess the merits of pleading Roach not guilty. In the time that counsel did have to discuss with Roach and his family the possibility of pleading guilty, counsel did ask what effect the "Crystal THC" had on Roach and, upon Roach's response, became convinced that the drug did not alter Roach's mental functioning except to make Roach feel "racy" and have more self confidence.

■ Present counsel now attempts to show that the drug injected was not Crystal THC, THC being the active ingredient of marijuana, but rather was PCP which causes violence and psychotic behavior. With this theory, present counsel asserts that trial counsel was deficient in failing to discover that the drug was PCP. This contention is without merit. Even if the drug were PCP and not THC, an assumption highly speculative at best, we think counsel adequately discovered the effects of the drug on Roach and reasonably concluded that Roach remembered too many details of the murders to pursue a defense based on alcohol and drugs. Counsel's actions in this regard were informed strategic choices based on information supplied by Roach

and reasonable reliance on such. *See Strickland,* 104 S.Ct. at 2065.

▬ Presumably to argue that Roach's drug injection was involuntary so as to avoid the law in South Carolina that voluntary drug injection is no defense to a crime in that State, *see State v. Crocker,* 272 S.C. 344, 251 S.E.2d 764 (1979), present counsel has asserted that trial counsel should have investigated HD to discover that substance abuse is an involuntary symptom of HD. In other words, counsel should have discovered that HD caused Roach to abuse substances excessively and that this abuse was not voluntary intoxication or drug use. We think the argument lacks merit. The argument assumes that Roach had HD at the time of the murders and that the presence of the disease caused Roach to abuse intoxicating substances. Since Roach clearly was not diagnosed to have HD at the time of the murders, the argument fails. The same principles apply as an answer to Roach's claim of failure to prepare a mitigation defense based on intoxication and drug use.

▬ Present counsel also asserts that trial counsel was ineffective in preparing a case in mitigation on the theory of involuntary intoxication. In this regard, counsel reasserts the claim that trial counsel should have investigated and developed evidence with respect to the type of drug Roach injected and the effects HD might have had on Roach. [Id] We do not agree because, for many of the reasons we stated before, counsel made reasonable and informed strategic decisions under the circumstances then existing. While we do not think counsel was deficient in preparing a case in mitigation, especially in view of the fact that the sentencing judge found several mitigating circumstances based on Roach's mental deficiencies and drug use, we are of opinion that Roach was not prejudiced by any failure of counsel to develop evidence based on HD or drug-induced psychosis. The record clearly shows that the sentencing judge considered Roach's drug use as well as mental deficiencies. Moreover, to the extent that there is ample

evidence in the record to support the finding that Roach was not psychotic at the time of the murders, and trial counsel steadfastly believed such, we think present counsel's drug-induced psychosis theory clearly is a product of hindsight.

▬ Entirely apart from the argument that counsel was ineffective in preparing a defense or case in mitigation is the present assertion that the pleas and sentences are invalid because Roach was being represented by lead counsel Walter Brooks who, at the time, was under investigation for disbarment by the South Carolina Board of Commissioners and Grievances. In essence, Roach claims that because Brooks was representing Roach at a time when Brooks was under investigation by the State Bar authorities, it was an inherent unconstitutional conflict of interest for Brooks to represent Roach since the State of South Carolina was prosecuting Roach. For purposes of determining ineffectiveness under *Strickland,* we would presume prejudice from such representation "only if the defendant demonstrates that counsel 'actively represented conflicting interests' and 'that actual conflict of interest adversely affected his lawyer's performance.'" *Strickland,* 104 S.Ct. at 2067, *citing, Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980).

Roach has failed to show an actual conflict of interest. First, Brooks was not under investigation by the same authorities that were prosecuting Roach. Secondly, Roach has made no showing that this alleged conflict of interest impaired Brooks' ability to defend Roach. The state postconviction court and the district court below conducted a review of the disbarment record and found that the transcripts were totally devoid of any evidence or allegation casting doubt on Brooks' ability to represent his client Roach. At this juncture, we note that counsel for Roach candidly admitted at oral argument that while no allegations in the disbarment records would cast doubt on Brooks' representation, the records nevertheless were critical because they would indicate an alleged impropriety

based on the timing of the disbarment proceedings. The disbarment proceeding was under way but undecided at the time Brooks represented Roach, but was decided after Roach's trial and while the post-conviction court was considering the case.

We cannot accept such an argument, totally unsupported by any allegation or evidence of impropriety, because the effect of such a holding would be to establish a *per se* rule of unconstitutional ineffectiveness in any situation in which an attorney has undertaken representation of a criminal defendant while such an attorney is under investigation for disbarment. In this case we think there was neither impropriety nor the appearance of it.

B. *Voluntariness of the guilty pleas*

Roach has made the bare allegation that, based upon the totality of the circumstances, his pleas were involuntary and thus unconstitutional. The South Carolina Supreme Court on direct review *sua sponte* considered the issue of the voluntariness of the guilty pleas and determined that Roach knowingly and voluntarily entered the guilty pleas. 255 S.E.2d at 801. The state post-conviction court examined the question and also found that the pleas were voluntary. The district court conducted its own review of the record of the guilty plea proceeding. After finding that Roach pleaded guilty freely and voluntarily with a full understanding of the consequences, the district court determined that the guilty pleas were valid under *Henderson v. Morgan*, 426 U.S. 637, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976), and *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

In his brief, as noted, Roach asserts that based on the totality of the circumstances, his pleas were involuntary. Apart from this bare allegation, Roach does not direct our attention to particular circumstances which, if taken cumulatively, would cast doubt upon the voluntariness of the guilty pleas. Thus, we will assume that Roach bases his claim on the premise that we should assess the voluntariness of the guilty pleas by considering the cumulative

effect of trial counsel's alleged deficient performance and Roach's mental deficiencies on Roach's ability to enter a valid guilty plea. Like the courts before us, we find that Roach's guilty pleas were given knowingly and voluntarily.

Since we have shown that trial counsel was not deficient in representing Roach at the guilt phase, we need only discuss whether Roach's mental deficiencies affect the validity of the guilty pleas.

■ To show incompetence to plead guilty, a defendant must demonstrate that "his mental faculties were so impaired ... when he pleaded that he was incapable of full understanding and appreciation of the charges against him, of comprehending his constitutional rights and of realizing the consequences of his plea." *Shaw v. Martin*, 733 F.2d at 314, *citing United States v. Truglio*, 493 F.2d 574, 578 (4th Cir.1974). In *Shaw* we determined that this standard of competence to plead guilty paralleled the standard the Supreme Court established in *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam), for competence to stand trial. *See* 733 F.2d at 314.

■ The record shows that Dr. Lockhart was of opinion that Roach was competent, as was the State Hospital, although Roach was a borderline mental retardate suffering from an antisocial personality disorder. The sentencing judge posed a series of questions to counsel and then to Roach to test whether Roach understood the nature of the charges against him and that, by pleading guilty to those charges, Roach was giving up his constitutional rights to a trial by jury, confrontation of accusers, and freedom from self incrimination. The sentencing judge further asked whether Roach was acting voluntarily in pleading guilty. Roach responded to each of the questions in the affirmative. We find that the "record establishes unequivocally that [Roach] was competent to stand trial and thus to plead guilty, and that he entered informed, intelligent, and voluntary pleas of guilty." *Shaw*, 733 F.2d at 315.

### III. CONSTITUTIONAL CHALLENGES

We have considered Roach's several contentions challenging the constitutionality of the South Carolina Death Penalty Statute and we find each to be without merit.

#### A. *Facial Attack*

Roach challenges the statute on both Due Process and Equal Protection grounds. First, Roach claims that the statute violates the Sixth, Eighth, and Fourteenth Amendments because it denies to individuals who plead guilty the opportunity for a jury determination as to the existence of statutory aggravating circumstances and the ultimate appropriateness of imposing the death penalty. We rejected a similar argument in *Shaw*, and we do so here on the ground that "[t]he Constitution does not give state criminal defendants the right to jury sentencing." *Shaw*, 733 F.2d at 317; *see Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).

Roach similarly attacks the statute on Equal Protection grounds by arguing that to the extent the statute provides for jury sentencing for individuals who request a jury at the guilt phase, but denies this opportunity to individuals who plead guilty, the statute creates an arbitrary and capricious classification. Roach further argues that because this is an arbitrary and capricious classification that implicates a fundamental interest, the State should be required to show a compelling state interest for the classification. For the reasons we stated in *Shaw*, we find that the South Carolina Death Penalty Statute does not violate the Equal Protection Clause. *Shaw*, 733 F.2d at 317; *see also Proffitt*, 428 U.S. at 252, 96 S.Ct. at 2966 (jury sentencing is not constitutionally required).

#### B. *Constitutionality of the statute as applied*

Roach claims that the statute is unconstitutional as applied because the death penalty has been imposed disproportionately upon individuals who have committed aggravated murder on white victims. Roach, who is white, makes no contention that the death penalty has been applied in a racially discriminatory manner based on the race of the defendant. Instead, Roach claims that the statute operates in a racially discriminatory manner because prosecutors are more likely to seek the death penalty in cases in which the victim is white as opposed to those cases in which the victim is not white. In this regard, Roach argues that he could prove this claim if he were afforded the opportunity to retain Dr. Paternoster for the purpose of eliciting testimony concerning Dr. Paternoster's examination of the post-*Gregg* application of the South Carolina Death Penalty Statute. Such inquiry would reveal, as Roach asserts, that a defendant charged with the aggravated murder of a white, rather than the aggravated murder of a nonwhite, has greater than three times the statistical chance that the prosecutor will seek the death penalty for him. In accordance with our disposition of the same issue in *Shaw*, we denied in Part II, B, *supra*, Roach's request to depose Dr. Paternoster because the evidence would be insufficient to support Roach's claim that the statute is applied discriminatorily on the basis of the race of the victim. Since we do not think that such evidence shows a discriminatory intent on the part of the prosecutors, we reject Roach's claim of racial discrimination in the application of the death penalty statute in accordance with our consistent disposition of the issue. *See Briley v. Booker*, 746 F.2d 225, 227 (4th Cir.1984); *Shaw*, 733 F.2d at 311–14.

Roach has also asserted several interrelated arguments in support of his contention that the statute was disproportionately applied. In this connection, Roach argues that the death sentence was constitutionally disproportionate because: (1) the South Carolina Supreme Court admittedly could not compare the proportionality of Roach's death sentence; (2) the sentencing authority did not make a specific finding of fact that Roach intended and personally took human life; and (3) the court made specific factual findings which precluded the finding that Roach had the requisite criminal intent necessary for the imposition of the

death sentence. We will discuss each of these contentions in order.

■ The South Carolina Supreme Court admitted that it was unable to compare Roach's sentence with similar South Carolina cases because Roach's case was the first case to be tried under the State's post-*Gregg* death penalty statute. 255 S.E.2d at 807. Roach argued that the South Carolina Supreme Court should have indicated which cases it found dissimilar and should have abstained from ruling the sentence proportionate until a sufficient number of comparative cases arose. We, like the courts before us, find this argument unpersuasive. Although the South Carolina statute requires a comparative proportionality review, S.C.Code § 16–3–25(C)(3),[20] such a comparative review is not constitutionally mandated. *Pulley v. Harris*, 465 U.S. 37, ——, 104 S.Ct. 871, 879, 79 L.Ed.2d 29 (1984). The Constitution does, however, require some form of meaningful review of death sentences to guard against arbitrary and inconsistent results. *See Jurek v. Texas*, 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976); *Proffitt v. Florida*, 428 U.S. 242, 258–60, 96 S.Ct. 2960, 2969–70, 49 L.Ed.2d 913 (1976); *Gregg v. Georgia*, 428 U.S. 153, 188–89, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976). Because we are of opinion that the South Carolina Supreme Court conducted an adequate Constitutional review of the death sentence at 255 S.E.2d, p. 806–07, we reject Roach's habeas corpus claim which is based on a perceived noncompliance with state law. *See Pulley*, 104 S.Ct. at 879; *Shaw*, 733 F.2d at 317; *Barfield v. Harris*, 719 F.2d 58, 61–62 (4th Cir.1983).

Next, Roach claims that his death sentence is disproportionate because the sentencing court failed to make a specific finding of fact that Roach intended to kill or personally took human life. He further asserts that the state court made contrary findings of fact that would have negated the specific criminal intent necessary for imposing the death sentence. Essentially, Roach now contends that he was not a triggerman and therefore the death sentence is disproportionate under *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). In *Enmund*, the Supreme Court reversed a death penalty imposed by the State of Florida. 458 U.S. at 801, 102 S.Ct. at 3378. The defendant in *Enmund* was charged and sentenced to death for felony murder accomplished during the course of an armed robbery. The Court noted that the state court record "supported no more than the inference that Enmund was the person in the car by the side of the road at the time of the killings, waiting to help the robbers escape." *Id.* at 788, 102 S.Ct. at 3372. Since the state court record did not show that Enmund killed, intended to kill, or otherwise contemplated that life would be taken, the Supreme Court reversed Enmund's death sentence. *Id.* at 801, 102 S.Ct. at 3378.

■ Roach claims, in effect, that, since the sentencing court did not find specifically that Roach was a triggerman, *Enmund* would preclude imposition of the death penalty. The state court record, however, clearly supports the finding that Roach was a triggerman. Roach now maintains that on the basis of exculpatory statements he made and a witness made (whose testimony Roach's petition describes as "going so poorly"), that he was not a triggerman, there is no evidence in the record that the sentencing court considered such statements. We are unpersuaded by such an argument. Furthermore, even if we did not consider the evidence in the record clearly supporting a finding that Roach was a triggerman, we think the district court correctly determined that Roach set out on a course of

---

**20.** S.C.Code § 16–3–25(C)(3) provides that upon direct mandatory review of a death sentence, the South Carolina Supreme Court shall determine:

 (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, concerning both the crime and the defendant.

*Id.* S.C.Code § 16–3–25(E) further provides:

 (E) The court shall include in its decision a reference to those similar cases which it took into consideration.

criminal conduct and, "[a]t a minimum, Roach, unlike Enmund, contemplated that life would be taken." We find that Roach's death sentence is not invalid under *Enmund* since the state court record clearly supports a finding that Roach took life or contemplated that life would be taken. *See Enmund*, 458 U.S. at 801, 102 S.Ct. at 3378.

Notwithstanding, Roach claims that the state court's specific findings of fact negate the criminal intent necessary for imposition of the death penalty. In particular, Roach argues that instead of finding that Roach specifically intended to kill, the sentencing court found numerous facts that negated the intent to kill, including: Roach was under the influence of extreme emotional or mental disturbance at the time of the offenses; Roach's capacity to conform his conduct to the requirements of the law was substantially impaired; and Roach acted under duress or the domination of another person. Given these specific findings, and in the absence of a specific finding that Roach intended to kill, Roach argues that it would be disproportionate to impose the death sentence because he was 17 at the time of the offenses, he had no significant prior criminal history, he is a borderline mental retardate, he was under the influence of drugs at the time of the offenses, and there was a 50% chance that his drug abuse was involuntary because of the 50% likelihood that he has a terminal brain deteriorating disease which destroys brain neurons.

■■■ Contrary to Roach's argument, we are of the opinion that the sentencing authority carefully considered Roach's mental condition in mitigation and concluded that the balance of aggravating and mitigating circumstances warranted imposition of the death sentence. Moreover, we do not think that the factfindings of the court negate the necessary specific intent to kill which, we have found, is a finding clearly supported by the record. Additionally, to the extent that Roach asserts it would be disproportionate to impose the death sentence on him because he was involuntarily under the influence of hallucinogenic drugs, we think that such an assertion is belied by the record. While Roach maintains that he had a shot of an hallucinogenic drug, PCP, a fact hardly supported by the evidence, the record does not support a finding that Roach was in fact hallucinating at the time of the murders; indeed, it negates that conclusion. The sentencing court was aware of Roach's drug and alcohol use and fully considered such in finding several mitigating circumstances. As for the possibility that HD might have caused Roach to abuse substances, we think that this possibility is adequately disposed of earlier in this opinion. There simply is no diagnosis that Roach has the Huntington's gene, and no evidence at all that those who do not have it have involuntary aberrational behavior merely because a parent may be suffering from the disease.

■■■ One final point is Roach's assertion that it would be disproportionate to impose the death sentence because he may suffer from a brain deteriorating disease which inevitably causes dementia. For the reasons we previously stated, we do not think that a positive diagnosis that Roach has the HD gene would preclude imposition of the death sentence.

## IV. TOTALITY OF THE CIRCUMSTANCES

■■■ Roach argues that based on the totality of the circumstances he was denied a fundamentally fair trial. In this regard he alleges that he was prejudiced by Dr. Camp's testimony, by extensive pretrial publicity, by the short length of time (39 days) he had to prepare a defense and case in mitigation, and by a biased sentencing judge. We disagree. We have considered the proceedings against Roach as a whole and the entire record on appeal and are of opinion that Roach received a fair trial in every sense of the word, constitutionally and otherwise.

We accordingly affirm the judgment of the district court.

All stays of execution which may have been issued by us or by the district court shall be, and they hereby are, dissolved.

AFFIRMED.