Syvasky Lafayette POYNER, Petitioner–Appellant,

v.

Edward W. MURRAY, Director, Virginia Department of Corrections, Respondent–Appellee. (Six Cases)

Nos. 91–4001 to 91–4006.

United States Court of Appeals, Fourth Circuit.

Argued July 31, 1991.

Decided May 8, 1992.

Alexander Hoke Slaughter, McGuire, Woods, Battle & Boothe, Richmond, Va., argued (Catherine Currin Hammond, Dorothy C. Young, McGuire, Woods, Battle & Boothe, Harry M. Johnson, III, Hunton & Williams, Richmond, Va., on brief), for petitioner-appellant.

Katherine Baldwin Toone, Asst. Atty. Gen., Office of Atty. Gen., Richmond, Va., argued (Mary Sue Terry, Atty. Gen. of Va., Richard B. Smith, Marla L. Graff, Asst. Attys. Gen., on brief), for respondent-appellee.

Before RUSSELL, WIDENER, and HALL, Circuit Judges.

## OPINION

WIDENER, Circuit Judge:

Syvasky Lafayette Poyner challenges the judgments of three Virginia state courts, each sentencing him to death. The United States District Court for the Eastern District of Virginia denied each of Poyner's three petitions for writs of habeas corpus. We affirm.

Poyner was convicted of five counts of capital murder after three separate trials in the respective circuit courts of the Cities of Williamsburg, Hampton, and Newport News, Virginia. On June 6, 1984, Poyner was convicted after a jury trial in the Circuit Court of the City of Williamsburg for the capital murder of Clara Louise Paulette and Chestine Brooks. The Williamsburg jury on each count fixed Poyner's penalty at death on the statutory ground that there was a probability that he "would commit criminal acts of violence that would constitute a continuing serious threat to society." Va.Code Ann. § 19.2–264.2. The Williamsburg court entered judgment on the jury's verdicts and accepted its recommendations of death.

Poyner's second trial took place on June 13, 1984, before the Circuit Court of the City of Hampton sitting without a jury. The Hampton court found Poyner guilty of the capital murder of Carolyn J. Hedrick and Joyce M. Baldwin. The court, after hearing testimony regarding the aggravating and mitigating circumstances surrounding the crimes, sentenced him to death on each count of capital murder. In fixing Poyner's sentence at death the Hampton court found both that he posed a continuous threat to society and that his acts were

"outrageously vile, horrible, and inhuman" and "involved depravity of mind and aggravated battery to the victims." Va.Code Ann. § 19.2–264.2.

Poyner's final trial was before a jury in the Circuit Court of the City of Newport News. On July 11, 1984, that jury convicted him of the capital murder of Vicki Ripple. Following the sentencing phase of the trial, the jury found that Poyner's conduct and history indicated a probability that he would pose a continuous serious threat to society. Consequently, the jury fixed Poyner's penalty at death, and the trial court thereafter accepted the jury's recommendation and entered judgment on its verdict.

Poyner appealed all five convictions and death sentences to the Supreme Court of Virginia. That court affirmed each conviction and death sentence, *Poyner v. Commonwealth*, 229 Va. 401, 329 S.E.2d 815 (1985), and the United States Supreme Court denied his petition for a writ of certiorari. *Poyner v. Virginia*, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 158 (1985).

Poyner then sought collateral review of these convictions in the Virginia state courts. Petitions for writs of habeas corpus were filed on Poyner's behalf in each of the three convicting courts. Each court denied the respective petition after hearing argument but without holding evidentiary hearings, and the Supreme Court of Virginia, finding no error in any of the denials, refused Poyner's petitions for appeal. The United States Supreme Court subsequently denied his second petition for a writ of certiorari. *Poyner v. Bair*, 488 U.S. 871, 109 S.Ct. 185, 102 L.Ed.2d 154 (1988).

Poyner next sought relief from the federal courts. On January 12, 1989, he filed three separate petitions for writs of habeas corpus in the United States District Court for the Eastern District of Virginia. The district court referred these petitions to a United States Magistrate who, in three lengthy and thorough reports, recommended that all of Poyner's petitions be denied and dismissed. Poyner filed objec-

tions to the Magistrate's reports. By three final orders dated December 21, 1990, the district court adopted and approved the findings and recommendations in the magistrate's reports, denied Poyner's objections, and dismissed his petitions. Neither the magistrate nor the district court held an evidentiary hearing as Poyner had requested. Poyner then moved the district court to alter or amend those final orders under Fed.R.Civ.P. 59(e). The district court denied that motion, and these appeals followed.

A summary of the conduct for which Poyner was sentenced to death is necessary to the discussion of his claims on appeal. The record reveals that Poyner's actions during an eleven-day period in 1984 left five women from the Tidewater area of Virginia dead, all victims of gunshot wounds to the head.[1] Poyner's robbery and murder spree began around noon on January 23, 1984, when he was riding around the City of Hampton in an automobile that he had stolen earlier that morning. Poyner entered a hair salon, which he chose "just on impulse," with the apparent intention of robbing the occupants. The clerk, Joyce M. Baldwin, mistook Poyner for a customer and began showing him various hair care products. In response, Poyner pulled a .38 caliber revolver and demanded money. She complied, opening the cash register and placing between forty and sixty dollars in a bag. Poyner then ordered her to walk to the back of the store. Now crying and begging him to spare her life, she turned her back to Poyner and began to walk. At that moment Poyner shot her in the back of the head from a range of approximately four to six feet, mortally wounding her.

Seven days later, around noon on January 30, 1984, Poyner left his home in the City of Newport News, stole another automobile, and drove to the City of Williamsburg. Once in Williamsburg, he selected a motel, again "just on impulse," and again for the apparent purpose of robbing the

---

**1.** These facts appear in the Supreme Court of Virginia's opinion in *Poyner v. Commonwealth*, 229 Va. 401, 329 S.E.2d 815, *cert. denied*, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 158 (1985), and are not disputed.

clerk. There Poyner found an elderly woman, Clara Louise Paulette, the manager of the motel. He pointed his gun at Mrs. Paulette and demanded money. She told Poyner he had "hit her at a bad time," but she gave him what money she had, approximately forty dollars.

While the armed robbery of Mrs. Paulette was in progress, Chestine Brooks, a housekeeper at the motel, walked into an adjacent room and saw what was happening in the motel office. When Poyner saw Mrs. Brooks, he ordered her and Mrs. Paulette into a kitchen area near the office and forced them to turn and face away from him. He then shot both women in the backs of their heads from close range, killing them.

Poyner killed again the next day, January 31, 1984, this time in the City of Newport News. That morning Poyner stole yet another automobile and proceeded to ride around the streets of Newport News. At around noon he passed an ice cream store in which he observed Vicki Ripple working alone. Poyner parked the car and entered the store, where Miss Ripple was cleaning up. He pointed his gun at her and demanded money, causing her to put the money from the cash register into a bag and hand it to him. Miss Ripple then walked into the corner of the store and covered her head. Poyner responded by shooting her in the back of the head and leaving her to die.

Poyner walked from his home in Newport News to Hampton on the morning of February 2, 1984. At around noon that day, he observed Carolyn J. Hedrick emerge from a store and begin to get into her car. He approached Mrs. Hedrick with a gun in his hand and told her that he wanted her money and that she was to get into her car. She screamed and appeared nervous, but she nonetheless complied and got into the passenger seat of her car. Poyner got into her car, began driving, and ordered her to remove her clothing, which she did. Poyner stated that he did this so that she would be less likely to attempt escape by jumping out of the car. He continued driving until they reached a parking lot behind a church, where he pro-

ceeded to rape her. After raping her, Poyner shot her in the left side of her head as she sat in the passenger seat of her car, crying and begging him not to shoot her. After taking no more than forty dollars from her pocketbook, Poyner pushed her nude body from the car and drove away. That afternoon Poyner continued driving around the Newport News area in Mrs. Hedrick's car, at one point stopping at a local barber shop, where he attempted to sell some candy that he had found in the Hedrick car.

On February 3, 1984, Newport News police officers discovered the Hedrick car parked in the vicinity of the church parking lot where her body had been found. Poyner's fingerprints were found inside the car, and eyewitnesses reported seeing him driving the car during the afternoon of the Hedrick murder. Poyner was arrested on February 4, 1984 by detectives of the Hampton police department and thereafter was indicted for the capital murder of Carolyn J. Hedrick. Also on February 4, a search warrant for Poyner's home was obtained. The resulting search yielded the keys to Mrs. Hedrick's car and a .38 caliber revolver that forensic analysis later established as the weapon that killed Mrs. Hedrick. Within hours of being taken into custody for the Hedrick murder, Poyner confessed to killing Mesdames Baldwin, Paulette, Brooks, Ripple, and Hedrick.

During the course of his confession on February 4, 1984, Poyner told the interrogating detectives that he chose only women as his victims because women are afraid of guns and are easier to rob than men. Poyner further stated that he killed his victims so that they would be unable to identify him later, as during previous jail terms his fellow prisoners had told him that they wished they had killed the people they had robbed. Poyner identified various marital difficulties as his only motivation for these crimes.

Having described the events that led to Poyner's convictions and death sentences, we now turn to his claims for relief. In urging reversal of the district court's denial of his petitions Poyner asserts the fol-

lowing grounds: (I) that the state trial courts erroneously admitted certain confessions that were obtained from Poyner in violation of his rights under *Miranda v. Arizona;* (II) that the performance of his trial counsel was so ineffective as to deny him his rights to counsel under the sixth and fourteenth amendments to the United States Constitution; (III) that Virginia's system of appointing counsel for indigent defendants violated his right to due process under the fifth and fourteenth amendments to the United States Constitution; and (IV) that the district court erred in refusing to grant him an evidentiary hearing on his *Miranda* and ineffective assistance claims. We now address these claims.

## I.

### A.

Poyner first contends that his convictions were the result of confessions obtained in violation of his rights under the fifth amendment as defined in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its progeny. The specific sequence of events surrounding the arrest and interrogation of an accused is particularly relevant where *Miranda* issues are raised; thus, a summary of those events follows.

Upon his arrest during the early morning hours of February 4, 1984, Poyner was brought to the Newport News police station. There he was placed into the custody of Detective Spinner of the Newport News police department and Detective Browning of the Hampton police department. Upon Poyner's arrival, Detective Spinner orally advised him of his *Miranda* rights before any interrogation took place and before Poyner made any statements to anyone. Poyner told Spinner and Browning that he understood his rights.

Next, Spinner and Browning took Poyner before a Virginia Magistrate, who advised him of the charges against him and that he would be held without bond.[2] Poyner then was taken to another room in the police station, where Spinner again advised him of his rights to remain silent and to have an attorney present before any questioning. Poyner again indicated that he understood his rights.

Spinner then informed Poyner that the police were aware of Poyner's involvement with Mrs. Hedrick's car and that Poyner had been seen trying to sell candy from that car on the afternoon of her murder. Poyner responded by saying "Didn't you say I have a right to an attorney," to which Spinner replied "Yes, you do, that is correct." Momentarily believing that Poyner had intended to invoke his right to counsel, Spinner and Browning began to rise from their seats and terminate the interrogation. As Spinner and Browning rose, Poyner said "Let me tell you about the car."

Spinner and Browning then sat back down and Poyner proceeded to tell the detectives that he had been in the neighborhood where witnesses had reported him and that he had given a man there some candy. Browning's next words were "Did you kill her?", to which Poyner responded "Yes." In response to further questioning by the detectives, Poyner described in detail his abduction and murder of Carolyn Hedrick.

Though Poyner initially attempted to deceive the detectives as to the location of his crimes, he ultimately agreed to show Browning and Spinner the route that he had taken during his abduction and murder of Carolyn Hedrick. While Poyner and the detectives were retracing this route, other detectives were executing a search warrant at Poyner's home. These detectives informed Spinner and Browning that a .38 caliber revolver had been found underneath Poyner's mattress.

Upon returning to the police station at approximately 5:35 a.m., the detectives informed Poyner of their discovery of the revolver. The detectives told him that "the gun would be checked against the other murders in Newport News, Hampton and

---

**2.** See Va.Code Ann. § 19.2–80 (describing initial appearance before magistrate after arrest on warrant).

Williamsburg, and if [Poyner] knew anything about them, to tell [the detectives] now." To this Poyner responded "I did them all." He then made a brief statement on audiotape in which he described each of his five murders. Following this confession Poyner telephoned and then met with his wife, and finally was returned to jail at 7:20 a.m.

Detectives Spinner and Browning interviewed Poyner again at 8:50 p.m. the same day. At this time Poyner read and signed a written rights waiver form that Spinner had prepared. Poyner then proceeded to confess to each murder, and his confession was recorded on videotape. This videotape or a transcript thereof was later introduced into evidence, over Poyner's objection, in both the guilt and penalty phases of his three trials.

We note at the outset that the Virginia state courts' written findings of the foregoing historical facts are entitled to the presumption of correctness mandated by 28 U.S.C. § 2254(d), as we are of opinion that Poyner has failed to establish the applicability of any of the exceptions found in § 2254(d)(1)–(8), and we further are satisfied that the record amply supports the findings of fact relevant to Poyner's fifth amendment *Miranda* claim.[3] Whether the confession was obtained in a manner consistent with the Constitution is, however, a legal determination which we review *de novo.* See *Miller v. Fenton,* 474 U.S. 104, 109–12, 106 S.Ct. 445, 448–51, 88 L.Ed.2d 405 (1985); *Wilson v. Murray,* 806 F.2d 1232, 1235–36 & n. 2 (4th Cir.1986), *cert. denied,* 484 U.S. 870, 108 S.Ct. 197, 98 L.Ed.2d 149 (1987).

Poyner contends that his statement "Didn't you tell me I had the right to an attorney?" constituted a request for coun-

sel that, by virtue of *Miranda* and *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), should have ceased all interrogation until an attorney was present on his behalf. Because the detectives continued their questioning after this statement, Poyner argues that all of his confessions should have been excluded from evidence at trial. Both the district court and the Virginia Supreme Court rejected this argument and held that "Didn't you tell me I had the right to an attorney?" was at most only a request for clarification or reiteration of Poyner's *Miranda* rights and not a request for an attorney. See *Poyner,* 229 Va. at 410, 329 S.E.2d at 823.

A suspect's right to have counsel present under *Miranda* and *Edwards* attaches only when the suspect invokes that right during custodial interrogation by indicating in some manner that he wishes to consult with an attorney before speaking. See *Miranda,* 384 U.S. at 444–45, 86 S.Ct. at 1612–13. Assuming that the suspect is properly informed of his *Miranda* rights and makes a knowing, intelligent, and voluntary waiver of those rights, the police may interrogate the suspect without providing an attorney so long as the suspect does not ask for one. See *Patterson v. Illinois,* 487 U.S. 285, 290–91, 108 S.Ct. 2389, 2393–94, 101 L.Ed.2d 261 (1988). In this case it is undisputed that Poyner was advised of his *Miranda* rights and that he indicated that he understood them. The question, then, is whether the words "Didn't you tell me I had the right to an attorney?" constitute an invocation of the right to counsel under *Miranda.* We hold that they do not.

It appears that neither the Supreme Court nor this court yet has had occasion to

---

**3.** Poyner argues that a factual dispute exists over whether Poyner, during the initial interview by Spinner and Browning, said "Let me tell you about the car" or "Let me tell you about the murder I did." In denying Poyner's Fed. R.Civ.P. 59(e) motion to alter its previous order dismissing his habeas petition, the district court held that this factual dispute was irrelevant because either version of the statement would be sufficient to constitute a reinitiation of interrogation and a waiver of Poyner's fifth amend-

ment rights. Because we are in substantial agreement with the district court's analysis of the fifth amendment issue, we likewise are of opinion that this alleged factual dispute is irrelevant to this appeal.

Poyner also makes the related argument that the district court erred in denying Poyner's request for an evidentiary hearing on his fifth amendment claim. We address this argument separately at section I.B., *infra.*

consider the effect of a suspect's statement that, like Poyner's, mentions the *Miranda* right to counsel without suggesting any desire to speak with an attorney at that moment. However, in *Connecticut v. Barrett*, 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987), the Court made clear that the ordinary meaning of a suspect's words were to be given effect and that an expansive interpretation of a request for counsel is required only "where the defendant's words, understood as ordinary people would understand them, are ambiguous." *Barrett*, 479 U.S. at 529, 107 S.Ct. at 832. Moreover, other courts of appeal that have considered the effect of such statements have held that the mere mention by a suspect of the word "attorney" is not sufficient to invoke the right to counsel.

For example, in *United States v. Jardina*, 747 F.2d 945 (5th Cir.1984), *cert. denied*, 470 U.S. 1058, 105 S.Ct. 1773, 84 L.Ed.2d 833 (1985), the suspect stated during interrogation that he was "interested in seeing what type of deal he could arrange between the government and his attorney." *Jardina*, 747 F.2d at 948. The court correctly noted that once a suspect makes an equivocal request for an attorney, all interrogation must cease except that which is necessary to clarify whether or not the accused wants an attorney. *Jardina*, 747 F.2d at 948. The court held, however, that the suspect's statement was not an equivocal request for an attorney; rather, it was not a request at all. Thus, continued interrogation did not violate the suspect's *Miranda* rights. In so holding the court stated that "[t]he word 'attorney' has no talismanic qualities. A defendant does not invoke his right to counsel any time the word falls from his lips. Jardina's statements and actions did not invoke any present right to counsel." *Jardina*, 747 F.2d at 949 (citations omitted); see also *Norman v. Ducharme*, 871 F.2d 1483, 1486 (9th Cir. 1989), *cert. denied*, 494 U.S. 1031, 110 S.Ct. 1483, 108 L.Ed.2d 619 (1990). Poyner's statement seeking clarification of his right to an attorney was even less suggestive of a present intention to speak with an attorney than were the statements in *Jardina*. We find the reasoning of *Jardina* to be

persuasive on this point; therefore, we are convinced that the district court correctly held that Poyner did not request an attorney during his initial interrogation.

Our holding that Poyner did not make even an equivocal request for counsel is bolstered by Poyner's actions immediately following his statement inquiring about his right to counsel. When Poyner said "Didn't you tell me I had the right to an attorney?", Detectives Spinner and Browning, momentarily thinking that the interrogation had ended, began to get up from their seats and leave the room. At this moment Poyner interrupted their departure by saying "Let me tell you about the car." Poyner's obvious desire to prevent the detectives from leaving the room and to continue the questioning is wholly inconsistent with his present contention that he wanted to have an attorney present before further questioning.

Poyner insists that the decision in *Smith v. Illinois*, 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984), prevents any consideration of his subsequent statements when determining whether he in fact requested counsel. *Smith* involved a suspect who had been arrested on charges of armed robbery. The detective interrogating Smith concluded his recitation of the *Miranda* warnings with the words "You have the right to consult with a lawyer and to have a lawyer present with you when you're being questioned. Do you understand that?", to which Smith replied *"Uh, yeah. I'd like to do that."* *Smith*, 469 U.S. at 93, 105 S.Ct. at 491 (emphasis in opinion). After Smith made this unequivocal request for counsel, the detectives continued asking questions until he agreed to speak to the detectives without obtaining an attorney. *Smith*, 469 U.S. at 93–94, 105 S.Ct. at 491–492. Smith was convicted on the strength of his ensuing confession, and the Illinois state court affirmed his conviction on the grounds that his statements following his apparent request for counsel demonstrated that he in fact had not intended to invoke his *Miranda* right. The Supreme Court reversed and held that a suspect's responses to subsequent interro-

gation may not be used to cast doubt on the clarity of a prior *unambiguous request* for counsel. *Smith,* 469 U.S. at 98–100, 105 S.Ct. at 494–495.

The case at bar, in contrast, presents the entirely distinct situation of a statement that is not a request for counsel at all, equivocal or otherwise. In this situation, the substance of the colloquy between police officer and suspect taken as a whole is clearly relevant to a determination of whether the suspects' fifth amendment rights have been violated. Moreover, the interests sought to be protected by the *Smith* decision—that the police should not be allowed to "wear down" the accused by post-request badgering—simply are not implicated where a request for clarification of the right to counsel is immediately followed by both volunteered and responsive incriminating statements. Poyner's reliance on *Smith* is thus unavailing.

Poyner's final argument in support of his contention that his statement amounted to a request for an attorney rests on the fact that Detectives Spinner and Browning concededly believed that Poyner had requested an attorney. When Poyner said "Didn't you tell me I had the right to an attorney?", the detectives rose from their seats, believing Poyner had just terminated the interrogation. According to Poyner, the detectives' subjective, momentary impression that Poyner wanted to cease the questioning and speak to a lawyer is somehow dispositive of the ultimate legal determination of whether he did in fact make such a request.

However, we find no support in the post-*Miranda* cases for such a rule. To the contrary, in the closely-related context of determining when a suspect has effectively waived his *Miranda* rights, the Supreme Court has stated that "the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights." *Moran v. Burbine,* 475 U.S. 412, 423, 106 S.Ct. 1135, 1142, 89 L.Ed.2d 410 (1986). Detectives Spinner and Browning in this case displayed an admirable degree of solicitude for Poyner's *Miranda* rights, and

we decline the invitation to adopt an analysis that would penalize police officers for erring on the side of even excessive caution in observing the suspect's rights during custodial interrogation.

■ In addition to holding that Poyner did not request an attorney during his initial interrogation, both the district court and the Virginia Supreme Court held that, even assuming *arguendo* that a request was made, Poyner's subsequent volunteered statements constituted a reinitiation of the interrogation and a waiver of the *Miranda* right to counsel. *Poyner v. Commonwealth,* 229 Va. at 411, 329 S.E.2d at 823. We are in agreement with the district court that the facts of this case support the admission of Poyner's confession on either the first stated ground that no request was made or on the ground that, in any event, Poyner waived his fifth amendment rights by his volunteered statements following the supposed request for counsel.

The seminal case in the area of reinitiation of interrogation following a suspect's invocation of his *Miranda* right to counsel is *Edwards v. Arizona, supra. Edwards* announced the rule that "an accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with police." Edwards,* 451 U.S. at 484–85, 101 S.Ct. at 1884–85 (emphasis supplied). The *Edwards* opinion made clear, however, that statements volunteered by a suspect after requesting counsel are fully admissible, and in dictum the Court suggested that further statements elicited by resumed police interrogation likewise will be admissible, provided that, under the totality of the circumstances, the suspect voluntarily, knowingly, and intelligently waived his right to counsel. *Edwards,* 451 U.S. at 486 n. 9, 101 S.Ct. at 1885 n. 9.

Subsequent cases affirm the notion that whether the suspect voluntarily, knowingly, and intelligently waived his right to

counsel is a separate inquiry from the question of whether the suspect reinitiated interrogation. See *Smith v. Illinois*, 469 U.S. 91, 95, 105 S.Ct. 490, 492, 83 L.Ed.2d 488 (1984). The Virginia courts, including the Supreme Court, found that Poyner volunteered the words "Let me tell you about the car", and we agree with the district court that this statement satisfied the reinitiation component of the *Edwards* analysis. In *Oregon v. Bradshaw*, 462 U.S. 1039, 1046, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983), a plurality of the Court held that a suspect's inquiry "Well, what's going to happen to me now?" following a request for counsel was sufficient to constitute reinitiation, and we believe that Poyner's statement was even more indicative of a desire to resume discussion with the detectives than was Bradshaw's.[4] Cf. *United States v. Hines*, 605 F.2d 132 (4th Cir. 1979), *cert. denied*, 444 U.S. 1046, 100 S.Ct. 735, 62 L.Ed.2d 733 (1980) (volunteered statements not inadmissible under *Miranda* or the sixth amendment). Thus, our task is to determine whether, under the totality of the circumstances, Poyner effectively waived his right to counsel so as to make admissible his further statements made in response to the detectives' renewed questioning.

█ Whether a waiver of the right to counsel was voluntary is measured by the same standard as governs voluntariness determinations in the confession context. *Colorado v. Connelly*, 479 U.S. 157, 169–70, 107 S.Ct. 515, 522–23, 93 L.Ed.2d 473 (1986). Voluntariness here means that the waiver must have been "the product of a free and deliberate choice rather than intimidation, coercion, or deception" on the part of the police. *Moran*, 475 U.S. at 421, 106 S.Ct. at 1140. The record in this case is devoid of any evidence of such police misconduct. As we have already noted, the detectives here properly advised Poyner of his *Miranda* rights and acted with at least abundant caution by breaking off the interrogation at Poyner's mere mention of the word "attorney." Thus we are convinced that Poyner's waiver of his right to counsel by initiating the conversations and then responding to renewed questioning was voluntary within the meaning of *Edwards*.

█ Whether a waiver of the right to counsel was knowing and intelligent is determined by an examination of the totality of the circumstances surrounding the waiver. *Moran*, 475 U.S. at 421, 106 S.Ct. at 1140. The factors relevant to this inquiry may include the suspect's intelligence and education, see *Stawicki v. Israel*, 778 F.2d 380, 382–84 (7th Cir.1985), *cert. denied*, 479 U.S. 842, 107 S.Ct. 150, 93 L.Ed.2d 91 (1986), age and familiarity with the criminal justice system, see *McFadden v. Garraghty*, 820 F.2d 654, 661 (4th Cir.1987); *United States v. Cruz Jimenez*, 894 F.2d 1, 8 (1st Cir.1990), the proximity of the waiver to the giving of the *Miranda* warnings, *United States* ex rel. *Patton v. Thieret*, 791 F.2d 543, 547–48 (7th Cir.), *cert. denied*, 479 U.S. 888, 107 S.Ct. 284, 93 L.Ed.2d 259 (1986), and the "necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Edwards*, 451 U.S. at 486, n. 9, 101 S.Ct. at 1885 n. 9. An examination of the circumstances of Poyner's initial interrogation with these factors in mind leads us to the conclusion that Poyner's waiver of the right to counsel was knowing and intelligent. First, though Poyner's measured I.Q. of between 79 and 85 comes within the "dull normal" category, he nevertheless completed the eighth grade in school. He is able to read and write and was able to work and function in society, except during his many prior entanglements with the criminal law. We therefore find no cause to differ with the district court's finding adopting the magistrate's report that Poyner possessed sufficient mental ability to waive his right to counsel.

Second, the record reveals that Poyner was no stranger to the criminal justice system. Poyner's criminal activity began in 1970, as a juvenile, and he was convicted

---

4. Even using the measure of the concurring opinion, which would usually leave the question of waiver to the trial court, the waiver found here should be sustained. *Bradshaw*, 462 U.S. at 1047, 103 S.Ct. at 2835, Justice Powell, concurring.

of no fewer than twelve offenses, mostly misdemeanors but including felonies, prior to his 1984 capital murder convictions. Poyner's background provided him with at least some familiarity with his rights and with the process to which he would be subjected, and this background only supports the district court's finding of waiver.

Finally, the most compelling evidence that Poyner's waiver was knowing and intelligent comes from an examination of the sequence of events at the interrogation itself. Detectives Spinner and Browning orally advised Poyner of his *Miranda* rights at the outset of the initial interrogation, and Poyner indicated that he understood his rights. The detectives then summarized the evidence against him and asked him if he had anything to say. As discussed in detail above, Poyner responded by asking "Didn't you tell me I had the right to an attorney?", to which Spinner replied "Yes, you do, that is correct." At this moment, immediately after receiving the full *Miranda* warnings *and* an additional clarification of his right to counsel, Poyner initiated the conversation and chose to answer Browning's question "Did you kill her?" in the affirmative. To suggest that Poyner's conduct, after twice being advised of his right to counsel and after observing the detectives' willingness to cease the interrogation should he request counsel, was not knowing and intelligent simply strains credulity.

In sum, assuming *arguendo* that Poyner did request an attorney, we are in agreement with the district court that Poyner

voluntarily, knowingly, and intelligently waived his right to counsel. Consequently, the district court did not err in denying this claim of Poyner's petition.[5]

### B.

Poyner further argues that the district court erred in denying his request for an evidentiary hearing on his *Miranda* claim. According to Poyner, an evidentiary hearing would enable him to develop facts sufficient to demonstrate that his confessions were obtained in violation of his fifth amendment rights. Because we are satisfied that Poyner already has been afforded ample opportunity to develop such facts, we must deny relief on this claim.

■ A federal habeas corpus petitioner is entitled to an evidentiary hearing in the district court if (1) he alleges additional facts that, if true, would entitle him to relief; and (2) he is able to establish the existence of any of the six factors set out by the Court in *Townsend v. Sain*, 372 U.S. 293, 313, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963), or the related factors set out in 28 U.S.C. § 2254(d). See *Becton v. Barnett*, 920 F.2d 1190, 1192 (4th Cir.1990); *Bassette v. Thompson*, 915 F.2d 932, 940 (4th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1639, 113 L.Ed.2d 734 (1991); *Turner v. Bass*, 753 F.2d 342, 347 (4th Cir.1985), *sentence vacated on other grounds*, 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986). In an affidavit proffered for the first time after the district court denied and

5. We note that Poyner also argues, in a supplemental brief filed in this court on July 19, 1991, that his confession is inadmissible on the grounds that it was obtained in violation of his sixth amendment right to counsel. This specific argument was raised for the first time in an out-of-time brief before this court; thus, the argument likely is barred under principles of exhaustion, procedural bar, and the like. We need not examine those questions further, however, as we are satisfied that the sixth amendment argument is as devoid of merit as the fifth amendment-based argument.

Even assuming, without deciding, that Poyner's sixth amendment right to counsel attached upon his initial appearance before the magistrate, the absence of counsel during his interrogation does not make inadmissible his confes-

sion when he never invoked his right to counsel or, even if he did, he reinitiated communication with the detectives and thereafter waived his right to counsel. It is now clear that an accused may so waive his sixth amendment right to counsel, and that a waiver will be evaluated under the same analysis as are waivers of the fifth amendment right under *Miranda*. See *Patterson v. Illinois*, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988); *United States v. Muca*, 945 F.2d 88 (4th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 983, 117 L.Ed.2d 145 (1992). Thus, our holdings with respect to his fifth amendment claim are equally dispositive of the sixth amendment claim. Even the reserved question in *Patterson* is not present here for the Virginia Magistrate advised Poyner of the charges against him.

dismissed his petition,[6] Poyner alleges that he had intended to ask Detectives Spinner and Browning for an attorney and that the detectives "responded with statements like 'Let's take care of this business first' and 'Let's get this out of the way first.'" Poyner further alleges that the detectives led him to believe that he could not speak with an attorney for several days. Were these allegations true, we may assume without deciding that Poyner would be entitled to relief on his fifth amendment claims. Consequently, we must ask whether the state court fact-finding procedures were deficient in any of the ways set out in *Townsend*.

> *Townsend* held that:
> a federal court must grant an evidentiary hearing to a habeas applicant under the following circumstances: If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Townsend*, 372 U.S. at 313, 83 S.Ct. at 757. Our independent review of the record of each of Poyner's trials and of the opinion of the Supreme Court of Virginia[7] convinc-

es us that Poyner was afforded a full and fair hearing at the state level as to his fifth amendment claims. Upon Poyner's motion, each trial court held a lengthy suppression hearing at which Detectives Spinner and Browning, the only persons other than Poyner present during the interrogation in question, were examined and cross-examined. The record amply supports the state court's factual findings, and there is no allegation of procedural irregularity or unfairness.

■■■ The only ground that Poyner asserts for the proposition that the state court factual determinations were inadequate involves the nature of the legal arguments that his trial counsel made at his suppression hearings. Poyner's trial counsel did *not* make the *identical* fifth amendment argument at *each* of his suppression hearings that we reject today.[8] At the Newport News hearing Poyner's counsel sought to suppress his confession by arguing both that the *Miranda* warning given was imperfectly worded[9] and that his statement to the effect of "Didn't you say I had a right to an attorney?" amounted to a request for counsel that was ignored. On direct appeal the Supreme Court of Virginia addressed both arguments and found them unavailing. *Poyner*, 229 Va. at 411, 329 S.E.2d at 823. In the Hampton hearing Poyner's counsel argued only the wording of the warning ground, but the Commonwealth's Attorney raised the request for counsel ground and the Supreme Court of Virginia there reached both arguments. 229 Va. at 409–11, 329 S.E.2d at 823. Only

---

**6.** The district court, in denying Poyner's motion to alter or amend the judgment denying habeas corpus relief, refused to consider the contents of this affidavit. In our view, the district court correctly held that "[a] petitioner may not proffer evidence for the first time in a federal habeas corpus proceeding if he could have presented it at an earlier stage." See *Boggs v. Bair*, 892 F.2d 1193, 1199 n. 2 (4th Cir.1989), *cert. denied*, 495 U.S. 940, 110 S.Ct. 2193, 109 L.Ed.2d 521 (1990). On appeal we consider the contents of this affidavit only for the narrow purpose of determining whether Poyner has alleged facts which, if true, would entitle him to relief.

**7.** Findings of fact by a state appellate court are entitled to the presumption of correctness afforded by 28 U.S.C. § 2254(d), see *Sumner v.*

*Mata*, 449 U.S. 539, 545–47, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981), and thus are relevant to our inquiry as to the adequacy of the state court fact-finding procedures.

**8.** And, additional argument in this court is based on Poyner's affidavit filed January 7, 1991, years after trial and even after the district court's initial decision dismissing his petition. See note 6, *supra*, and associated text, pp. 1414–15.

**9.** The district court rejected this claim and Poyner did not pursue it before this court. In the trial court, Poyner had argued that the *Miranda* warning had to include the words "prior to any questioning" to be valid, although that plain meaning was otherwise set out.

in the Williamsburg case did the request issue not come up either in the suppression hearing or on direct appeal.

Poyner now argues that because, at least during the Williamsburg proceedings, the state courts charged with finding the facts did so with reference to a different, though related, fifth amendment issue in mind, we must remand for an evidentiary hearing on those issues. While generally it is true that a full and fair state court proceeding on a particular issue requires that the state courts "actually reach[ ] and decide[ ] the issues of fact tendered by the defendant," *Townsend*, 372 U.S. at 313–14, 83 S.Ct. at 757–58, we do not believe that the state courts in the instant case failed to reach and decide the issues of fact relevant to Poyner's fifth amendment claim. In all of the state proceedings, including Williamsburg, all the facts necessary to evaluate the admissibility of the confession under any aspect of fifth amendment law were adduced at full and fair suppression hearings. Poyner's real complaint here is not with the state court fact-finding procedures but rather with those courts' legal rulings on his alternative fifth amendment theories. This being the case, we find that Poyner has failed to establish any of the conditions set forth in *Townsend* or § 2254(d), and thus we find no error in the district court's denial of an evidentiary hearing on this issue.

## II.

### A.

■ Poyner's second argument on appeal is that the district court erred in denying relief on his claim that his trial counsel rendered constitutionally inadequate assistance during both the guilt and penalty phases of each of his three trials. Poyner alleges that his trial counsel rendered ineffective assistance at several different instances during each trial, and we consider each such claim in turn. First, however, we note that the state habeas courts denied all of Poyner's ineffective assistance claims, as did the district court. Whether counsel's performance was so inadequate as to be constitutionally infirm is a mixed question of law and fact, *Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984).[10]

In *Strickland v. Washington* the Court set out the now-familiar constitutional standard against which we measure the performance of a criminal defendant's trial counsel. To establish a violation of the sixth amendment requiring reversal of his conviction or vacation of his sentence, Poyner must prove (1) that "counsel's performance fell below an objective standard of reasonableness" in light of "prevailing professional norms," *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2064, and (2) that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068; see also *Briley v. Bass*, 750 F.2d 1238, 1247 (4th Cir.1984), *cert. denied*, 470 U.S. 1088, 105 S.Ct. 1855, 85 L.Ed.2d 152 (1985). Our task is to apply this standard to each of Poyner's specific claims of ineffective assistance.

■ Poyner first argues that his trial counsel rendered constitutionally ineffective assistance by mishandling his respective motions to suppress his confession during the pretrial stage of each of his three trials. According to Poyner, his trial counsel incorrectly chose to emphasize the alleged inadequacy of the wording of the *Miranda* warnings that he received prior to his first confession. He argues that his counsel should have pursued the legal tack that he has asserted in his collateral proceedings, *i.e.*, that his statements amounted to an invocation of his right to counsel and that he did not effectively waive that right under the principles announced in *Edwards v. Arizona*.

To begin, we note that Poyner's characterization of his trial counsel's performance

**10.** Poyner's related argument that he was erroneously deprived of an evidentiary hearing in the district court is addressed at section II.B., *infra*.

at his suppression hearings is not entirely accurate. As we have already described, in the Newport News hearing Poyner's counsel in fact did argue the *Edwards* ground as well as the inadequacy of the wording ground. There the trial court's ruling rested mainly on the warning issue, but the Virginia Supreme Court on direct appeal addressed both the adequacy of the warning and the *Edwards* issue. In the Hampton hearing, his counsel argued and the trial court ruled on only the warning issue, but the Commonwealth's Attorney argued that Poyner had reinitiated the interrogation under *Edwards*, and the Virginia Supreme Court again ruled on direct appeal on both the warning and *Edwards* arguments. Again, only in the Williamsburg hearing did the *Edwards* issue not come up, either at trial or on direct appeal.

In light of these facts we can easily dispose of Poyner's ineffective assistance claim as to the Newport News hearing. There his counsel ably elicited all of the necessary facts and competently presented two different, albeit unavailing, legal arguments for the suppression of the confessions. Though the trial court rejected these arguments and denied the motion, counsel's performance here clearly was not unreasonable in light of prevailing professional norms. Thus, we need not reach the prejudice element of the *Strickland* test as to this claim.

The other two suppression hearings present a slightly different situation. We do not doubt that under certain circumstances counsel's failure to recognize and argue a particular legal theory during a pretrial proceeding might amount to constitutionally unreasonable performance under *Strickland*. In these cases, however, we need not address that issue because we are confident that Poyner was in no way prejudiced by these alleged errors.

The Court in *Strickland* emphasized that when the petitioner suffered no prejudice within the meaning of that case, a reviewing court can and should dispose of the ineffectiveness claims on that ground, without evaluating counsel's performance. *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069. We believe this is such a case. Poyner essentially argues that his counsel erred by failing to argue a theory that was squarely rejected by the Supreme Court of Virginia, the federal district court, and this court. Even had his counsel vigorously argued the *Edwards* theory at the Williamsburg and Hampton hearings, we cannot say that there is a reasonable probability that those courts would have suppressed the confession. Thus, without expressing any opinion regarding the adequacy of counsel's performance, we hold that Poyner has failed to demonstrate prejudice with regard to this claim of ineffective assistance.

Poyner's next claims of ineffective assistance of counsel arise out of the penalty phases of his trials. These claims can be characterized generally as failure to investigate, develop, and present psychiatric evidence of Poyner's psychological condition as a mitigating factor. Poyner's specific claims, and our disposition of each, follow.

 First, Poyner relies upon the affidavit of a certain Dr. Park Elliott Dietz for the proposition that the psychiatrists and psychologists who evaluated Poyner prior to the penalty phases of his trials failed to conduct psychological tests of the type necessary to determine whether Poyner fits into one of the five categories of "serial killers" that Dr. Dietz has identified in his scholarly writings.[11] In his affidavit Dr. Dietz opines that Poyner may belong to a category of serial killers known as "Psychopathic Sexual Sadists" whose members are characterized by the "repeated intentional infliction of psychological or physical suffering in order to produce sexual excitement." Alternatively, Dr. Dietz suggests that Poyner may be a "Crime Spree Killer," one who kills "repeatedly during a series of crimes motivated by the search for excitement, money, and valuables," or a "Supposed Psychotic," one who claims "to

---

**11.** The remarkable apparent absence of an examination of Poyner by Dr. Dietz in support of his opinion is unexplained.

be acting at the direction of command hallucinations or under the influence of compelling delusions." Poyner argues that had his counsel and psychiatrists investigated and put on evidence of these conditions, the jury might have believed that Poyner was driven by a motive other than the simple expediency of preventing his robbery victims from identifying him. Consequently, according to Poyner, the jury would have found this to be a mitigating factor, and his counsel's failure to develop this specific type of psychiatric evidence amounts to constitutionally ineffective assistance. We find no merit in this argument.

Prior to the commencement of the trials in this case, each trial judge ordered that Poyner be sent to Central State Hospital for psychological evaluation. Between March 20 and April 2, 1984, Poyner underwent a wide range of diagnostic psychiatric and psychological examinations under the supervision of Dr. James C. Dimitris. These tests were designed to evaluate the possibility of an insanity defense, Poyner's competency to stand trial, and whether any mental conditions existed that might serve to mitigate the heinousness of his crimes. During the course of his examinations the Central State staff contacted Poyner's wife, father, step-father, and former psychiatrists. In addition to this court-ordered evaluation, Poyner's counsel retained Dr. Wendell J. Pile, a Newport News psychiatrist in private practice who had prior experience assisting in the defense of criminal defendants, to interview and evaluate Poyner. As part of his evaluation Dr. Pile and his staff met with Poyner for three days and contacted Poyner's stepfather as well as the same psychiatrists whom Dr. Dimitris consulted.

The results of these evaluations were not particularly promising from the standpoint of a defense attorney seeking to develop arguments in mitigation of five seemingly senseless, cold-blooded murders. Dr. Dimitris and the rest of the Central State Staff, which included both psychiatrists and psychologists, found that Poyner exhibited signs of suffering from both passive-aggressive and antisocial personality disorders. As noted above, Poyner's intelligence was evaluated at the "dull normal" level. The doctors further found that Poyner was neither "feebleminded" nor psychotic, and that he suffered from no disease of the mind or irresistible impulse. Dr. Pile, after an independent evaluation of Poyner, came to essentially the same conclusions regarding Poyner's psychiatric condition.

During the penalty phases of his three trials, Poyner's counsel chose to employ what little favorable psychological evidence was available to establish Poyner's mental condition and history as mitigating factors. Dr. Dimitris testified on Poyner's behalf at all three trials, and in each trial counsel produced evidence of psychiatric and like evaluations of Poyner's mental condition made prior to the instant offenses. In each penalty phase counsel ably elicited from Dr. Dimitris that Poyner suffered from the aforementioned maladies. The juries in Williamsburg and Newport News and the court in Hampton, it appears, simply found this and the rest of the mitigation testimony to be insufficient to outweigh the undeniably heinous nature of Poyner's crimes.

Our problem with this claim of ineffective assistance is twofold. First, Poyner's complaint here seems aimed not at the performance of his counsel but rather at the performance of Dr. Dimitris, Dr. Pile, and the Central State Hospital staff. The gravamen of this claim is that these psychiatrists were not experienced or imaginative enough to recognize that Poyner might have been motivated by sexual sadism, the crime-spree killer phenomenon, or some other psychological disorder that might support an argument that Poyner's killings were motivated by more than just a desire to evade capture and prosecution for robbery. However, this court in the past has made clear that there is no right to effective assistance of expert witnesses distinct from the right to effective assistance of counsel. A clear overtone to the argument is the proposition that if a defense attorney has not produced a witness who would agree with the after-the-fact diagnosis presently presented, then the attorney is

ineffective. We reject this proposition as we did its corollary in *Waye v. Murray*, 884 F.2d 765 (4th Cir.1989).

In *Waye*, we were faced with a claim that the psychiatrist who had testified at trial was incompetent in that he failed to emphasize sufficiently the petitioner's low intelligence and alleged diminished capacity. 884 F.2d at 766. Though we decided that case on procedural grounds, we took care to state that:

> While it is true that the tack the petitioner takes in this case principally is to disclaim inadequate performance of his attorneys on the one hand, and claim inadequate performance of his psychiatrist on the other, we think that no such rule should be inaugurated, even in a capital case. It will nearly always be possible in cases involving the basic human emotions to find one expert witness who disagrees with another and to procure an affidavit to that effect from the second prospective witness. To inaugurate a constitutional or procedural rule of an ineffective expert witness in lieu of the constitutional standard of an ineffective attorney, we think, is going further than the federal procedural demands of a fair trial and the constitution require.

884 F.2d at 766–67.

That there is no separately-cognizable claim of ineffective assistance of expert witnesses does not mean that a substandard performance by a psychiatrist at trial could never form the basis for habeas corpus relief. However, the constitutionally deficient performance must be that of counsel, in obtaining the psychiatric examinations or presenting the evidence at trial for example, not that of the psychiatrist or psychologist in failing to identify every possible malady or argument, no matter how tenuous.[12] As we have already noted,

in this case, at the behest of his trial counsel and the trial courts, Poyner was evaluated at length by the experienced psychiatric staff of Central State Hospital, as well as by independently employed Dr. Pile. Each of Poyner's trial attorneys thereafter put Dr. Dimitris on the stand and competently elicited the results of the evaluations. The mere fact that his counsel did not shop around for a psychiatrist willing to testify to the presence of more elaborate or grave psychological disorders simply does not constitute ineffective assistance. See *Roach v. Martin*, 757 F.2d 1463, 1477 (4th Cir.), *cert. denied*, 474 U.S. 865, 106 S.Ct. 185, 88 L.Ed.2d 154 (1985). To the extent, then, that Poyner's claims, as set out in Dr. Deitz's affidavit, relate only to the performance of his psychiatrists and psychologists, we deny relief.

■ Our second difficulty with this ineffective assistance claim is its suggestion that Poyner was prejudiced within the meaning of *Strickland* by his counsel's supposed failure to pursue the avenues of psychiatric inquiry advocated in Dr. Deitz's affidavit. In each penalty phase Poyner's attorneys faced the unenviable task of convincing the fact-finder that his crimes did not warrant the imposition of the death penalty. Poyner's counsel attempted to do so by introducing evidence intended to show that he was a generally good person who had been beset by legal, social, and emotional problems throughout his life, causing him finally to explode into violence. Toward this end, counsel in the Williamsburg and Newport News penalty proceedings presented the testimony of twelve and ten witnesses, respectively, including Poyner's relatives, friends, and psychiatrists, each of whom testified in a manner favorable to Poyner. Similar evidence was presented to the court sitting without a

---

12. We note that the Supreme Court's opinion in *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), is not to the contrary. *Ake* held only that due process requires that an indigent defendant be provided with the services of a competent psychiatrist at state expense when the defendant's mental condition is in

issue. 470 U.S. at 83, 105 S.Ct. at 1096. The Court disavowed any suggestion that the holding created a constitutional right of a defendant to choose a psychiatrist of his "personal liking." 470 U.S. at 79, 83, 105 S.Ct. at 1094, 1096. In all events, Poyner was examined by Dr. Dimitris

jury in Hampton.[13]

Given counsel's tactical decisions as to the best way to build a case in mitigation, we cannot say that their failure to delve more deeply into the risky realm of psychological mitigation evidence worked to create a reasonable probability that the outcome of any of Poyner's penalty proceedings would have been different. Dr. Dimitris and his staff include physicians and psychologists skilled not only in psychiatry and psychology, but in the forensic branches thereof, and Dr. Pile, a psychiatrist consulted by Poyner, as well as Dr. Howerton, a psychiatrist who testified on Poyner's behalf, were each fully qualified. No reason is shown in the record that the defense attorneys' reliance on their opinions was unreasonable.

In sum, we find the attorneys' performance in obtaining and presenting psychological evidence as a mitigating factor to fall well within the range of reasonable professional standards as required by *Strickland.* We are of opinion that the fact that a line of defense was not drawn as set out in the Dietz affidavit does not constitute ineffective representation. Consequently, we affirm the district court's denial of relief on that claim.

The balance of Poyner's ineffective assistance claims merit only brief attention. Each claim arises out of the penalty phase of one or more of his trials. They are: (1) that Dr. Dimitris gave the jury an incorrect definition of the passive-aggressive personality disorder; (2) that Dr. Dimitris erred in opining that Poyner's motive was to silence his robbery victims; (3) that Poyner's counsel failed to elicit from Dr. Dimitris that it was likely, given the nature of his condition, that Poyner would not be a future danger if incarcerated; (4) that his counsel and psychiatrists should have investigated

whether or not Poyner's wife was pregnant at the time of the crimes and whether Poyner suspected that he was not the father; (5) that his counsel and psychiatrists failed to offer an explanation as to why Poyner appeared cold and remorseless in his videotaped confession; and (6) that his counsel and psychiatrists failed sufficiently to develop and present evidence of Poyner's low intelligence as a mitigating factor.

We are of opinion that the above claims must fail for essentially the same reasons as did Poyner's central ineffective assistance claim as set out above. First, again it is apparent that the main thrust of these claims is not that Poyner's counsel performed unreasonably, but rather that Dr. Dimitris, Dr. Pile, Dr. Howerton and the Central State Hospital staff failed to provide the exact findings and testimony that Poyner would have liked. We need not today set out a sweeping rule regarding what degree of psychiatric investigation will suffice to satisfy the performance element of the *Strickland* standard; undoubtedly that will vary with the facts of each case. In this case, however, we are satisfied that Poyner's counsel did not act in a professionally unreasonable manner by having their client examined by the experienced psychiatric staff at a state-run mental health facility and by an experienced private psychiatrist as well as consulting a third psychiatrist who had treated Poyner some years previously.

Second, to the extent that the above claims are directed specifically at the performance of Poyner's trial counsel, we are satisfied that, even taken as a whole, the alleged errors did not prejudice Poyner within the meaning of *Strickland.* We must always be mindful that the standard of prejudice set out in *Strickland* requires

---

and staff, employed by the state, and by Dr. Pile and staff, chosen by Poyner.

**13.** In the Hampton penalty phase, Poyner's counsel put on only two witnesses, George W. Wakefield, a Virginia Department of Corrections official familiar with Poyner's experience as a juvenile offender, and Dr. Dimitris. In an affidavit made part of the record in the district court, Poyner's Hampton counsel stated that

they decided, after observing portions of the Williamsburg trial before a jury, that Poyner's best chance of avoiding the death penalty was to be tried by the Hampton court sitting without a jury. Because of the inherently different nature of a bench trial versus a jury trial, we cannot fault counsel's decision to limit the number and type of witnesses in the Hampton proceeding.

more than a mere possibility that the allegedly deficient performance may have prejudiced the defendant in any way. Quite to the contrary, the constitutional guarantee of effective assistance of counsel is violated only when an attorney's unprofessional errors were of such magnitude as to create a reasonable probability that the outcome of the proceeding in question would have been different. The Court further defined a reasonable probability as one "sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

In the instant case Poyner's trial counsel faced the Herculean task of convincing three courts that the killing of five women in the span of eleven days merited less than the most grave penalty that the law allows. When viewed in the light of the Commonwealth's devastating case at each of the penalty phases, the relative insignificance of trial counsel's alleged errors is clear. Consequently, we hold that any such errors, and we do not suggest there were any, were insufficient to undermine confidence in the outcome of the penalty proceedings, and we affirm the district court's denial of relief on these claims.

## B.

In addition to his substantive ineffective assistance claims, Poyner argues that the district court erred in denying his request for an evidentiary hearing on those claims. Poyner asserts, in part on the strength of the aforementioned affidavit of Dr. Deitz, that factual issues remain which, if resolved in Poyner's favor, would entitle him to relief on ineffective assistance of counsel grounds. Because we have already set out in detail the legal standard under which 2254 petitioners' requests for evidentiary hearings will be evaluated, see section I.B., we will not repeat it here. We note that neither the state courts nor the district court held an evidentiary hearing on Poyner's ineffective assistance claims. Therefore, the only question for resolution by this court is whether Poyner indeed has alleged facts which, if true, would entitle him to relief. We hold that he has not.

We can most easily dispose of Poyner's demand for an evidentiary hearing on the issue of whether his trial counsel was ineffective in handling the fifth amendment confession claims. Today we have affirmed the district court's denial of Poyner's substantive ineffective assistance claim on this issue, see part II.A. With the exception of a very few conclusory statements on brief, Poyner alleges no facts that would in any way alter our conclusion that his trial counsel's performance did not run afoul of the constitution. Therefore, an evidentiary hearing on this issue would be superfluous, and we affirm the district court's denial of this request.

Poyner's demand for an evidentiary hearing on his claims of ineffective assistance arising out of the penalty phases of his trials likewise must fail, as we find that he would not be entitled to relief on ineffective assistance grounds even if the facts were as he alleges. Poyner relies largely on the factual allegations in the affidavit of Dr. Deitz, as discussed in section II.A. above, for the proposition that an evidentiary hearing in the district court would allow him to establish facts that would entitle him to relief. However, for purposes of this appeal we have already considered the allegations in Dr. Deitz's affidavit and determined that, even assuming *arguendo* that they are true, they do not amount to constitutionally ineffective assistance of counsel. This being the case, an evidentiary hearing would be no more availing to Poyner on this issue than in the fifth amendment based ineffective assistance setting.

This court's most recent pronouncement on this issue, *Becton v. Barnett,* 920 F.2d 1190 (4th Cir.1990), does not compel the contrary result. In *Becton,* the petitioner sought habeas corpus relief from state court convictions on charges of rape, breaking and entering, and larceny from the person. Prior to and during the petitioner's trial and conviction, he had suffered extended and severe bouts of apparent mental illness, to such extent that he was involuntarily hospitalized on several occasions. *Becton,* 920 F.2d at 1191. Despite

the petitioner's history of psychiatric problems, his trial counsel did not investigate his competency to stand trial. Further, his counsel presented no evidence in his defense at trial and failed to file a notice of appeal on the petitioner's behalf. 920 F.2d at 1191.

The petitioner then applied for collateral relief from the conviction in state court on the grounds of ineffective assistance of counsel. The state court denied this claim without holding an evidentiary hearing. He then filed a petition for a writ of habeas corpus in federal court on the same grounds of ineffective assistance of counsel. The federal district court likewise declined to hold an evidentiary hearing and denied the petition.

However, this court vacated that denial and remanded the case to the district court for an evidentiary hearing on the petitioner's ineffective assistance claims. In so holding we stated that "[w]here material facts are in dispute the federal court in a habeas proceeding must hold an evidentiary hearing unless the facts were resolved in a prior state hearing." 920 F.2d at 1192. An examination of the petitioner's allegations convinced us that, if the facts indeed were as he had alleged, he likely would be entitled to relief. See 920 F.2d at 1194–95. Therefore, the petitioner was entitled to an opportunity to establish those facts in a federal evidentiary hearing.

▇▇▇ Poyner's reliance on *Becton*, however, is unavailing. *Becton* makes clear that a habeas corpus petitioner is entitled to an evidentiary hearing only to resolve disputed issues of *material fact*. 920 F.2d at 1192. The petitioner must "present[ ] a *colorable* claim" to relief, 920 F.2d at 1195 (emphasis supplied), by showing that the alleged additional facts, if true, would at least arguably compel the granting of the writ. In *Becton* the petitioner made such a showing by alleging in his petition (1) that he had informed his counsel before trial "that he had been in and out of mental hospitals prior to his arrest"; (2) that his counsel ignored his request to be evaluated for competency to stand trial; and (3) that his counsel failed to file a notice of appeal

despite the petitioner's express request. 920 F.2d at 1191–92. These allegations, when viewed in light of that attorney's performance at trial, were sufficient to create a colorable claim of ineffective assistance.

By contrast, that Poyner has failed to satisfy this threshold requirement is clear. We have already examined his allegations as cataloged in the Deitz affidavit, and we remain satisfied that they do not state a colorable claim of ineffective assistance. Thus, we affirm the district court's denial of an evidentiary hearing on these claims.

### III.

Poyner's final claim for relief concerns Virginia's method of appointing counsel to represent indigent defendants. Virginia has not adopted any formal, centralized mechanism for the appointment of counsel to indigent criminal defendants; rather, it appears that the presiding judge simply contacts and appoints a member of the bar to represent an indigent defendant. According to Poyner, this informal system caused undue delay in the appointment of trial counsel in each of his three capital murder cases. Poyner argues that this delay impinged his ability adequately to investigate and defend against the capital murder charges, and, thus, that Virginia's system of appointing counsel violates the due process clauses of the fifth and fourteenth amendments.

Poyner asserted this constitutional claim for the first time in his state petitions for writs of habeas corpus. At no time during any of his trials did he object to the method by which his counsel was appointed or to any delay or other prejudice allegedly caused thereby. Consequently, each state habeas court in dismissing his petition held that this claim was procedurally barred under the rule in *Slayton v. Parrigan*, 215 Va. 27, 205 S.E.2d 680 (1974), *cert. denied sub nom. Parrigan v. Paderick*, 419 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804 (1975), which prevents state habeas petitioners from raising nonjurisdictional claims that could have been but were not timely raised at trial or on direct appeal. The Supreme

Court of Virginia in each case denied Poyner's petition for review of these dismissals.

Poyner again raised his claim regarding appointment of counsel in Virginia in his petitions for writs of habeas corpus in the United States District Court. There the court, adopting the United States Magistrate's recommendation, dismissed this claim, holding that it was procedurally barred under the doctrine of *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Finding no error in that holding, we affirm.[14]

The United States Supreme Court in *Coleman v. Thompson*, — U.S. —, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), recently reaffirmed the principle that a federal habeas court is without power to grant relief on federal constitutional claims when a state court previously denied the petitioner relief on those claims for failure to present them in accordance with state procedural law. So long as the state court decision contains an accurate "plain statement" that the denial of relief rests solely on state procedural grounds, *Harris v. Reed*, 489 U.S. 255, 265, 109 S.Ct. 1038, 1044, 103 L.Ed.2d 308 (1989), such a procedural default constitutes an adequate and independent state ground for the petitioner's custody. Under these circumstances a federal habeas court may hear a procedurally defaulted claim only in the rare instance when the petitioner can show both good cause for the default and actual prejudice resulting from the alleged constitutional violations. See *Coleman*, — U.S. at —, 111 S.Ct. at 2561–67; *Wainwright*, 433 U.S. at 87, 97 S.Ct. at 2506.

Initially, we are satisfied that the decisions of the Virginia courts dismissing Poyner's claims that Virginia's method of appointing counsel is unconstitutional were based solely on state procedural grounds as contemplated by *Harris v. Reed*. Each state trial court stated explicitly that this claim was "procedurally barred" and cited *Slayton v. Parrigan*, the case setting out Virginia's procedural default rule. The Supreme Court of Virginia in each case denied Poyner's petition for appeal. Thus, our only inquiry is whether the district court correctly held that Poyner failed to establish good cause for his default and prejudice resulting therefrom.

As cause for his procedural default Poyner asserts that (1) his claim that Virginia's system of appointment of counsel for indigent defendants violates the Constitution is so novel that it falls within the ambit of *Reed v. Ross*, 468 U.S. 1, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984); (2) his trial counsel's failure to raise the objection amounts to constitutionally ineffective assistance of counsel; and (3) that the gravity of the sentence he faces militates in favor of our addressing the issue. The district court rejected each of these arguments and held the claim barred.

■■■ As for the latter two assertions of cause, the district court's rejection plainly was correct. Poyner's counsel did not act in a professionally unreasonable manner in failing to raise this decidedly tenuous constitutional claim. See *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (error of counsel may constitute cause for procedural default only when error rises to level of constitutional deprivation under *Strickland*). With the benefit of hindsight, rarely can it be said that trial counsel made every possible objection and raised every conceivably viable legal argument. See *Strickland*, 466 U.S. at 669, 104 S.Ct. at 2055. The law, however, requires not perfect but only professionally reasonable performance of counsel, and we are confident that Poyner's counsel did not run afoul of that standard in not raising this objection.

Further, the Court has expressly rejected the claim that federal habeas corpus law in

---

14. We note that the Commonwealth urges us to hold that this claim must be dismissed because granting relief would require announcing a "new rule" of constitutional law in contravention of the nonretroactivity doctrine of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). While we have not decided whether a case is to be decided under *Teague* or *Wainwright* where both may arguably apply, the language in *Coleman, infra*, referring to a lack of power, probably indicates that *Wainwright* is the preferred route.

**1424**

general, and the law of procedural bar in particular, should operate any differently in cases in which the sentenced challenged is that of death. See *Smith v. Murray*, 477 U.S. 527, 538, 106 S.Ct. 2661, 2668, 91 L.Ed.2d 434 (1986). Therefore, the presence of a death sentence alone cannot constitute cause for a state court procedural default.

■ Poyner's argument that the claim regarding the appointment of his counsel is novel within the meaning of *Reed v. Ross, supra,* should have some further discussion. Procedural default may be excused when the defaulted claim is "so novel that its basis [was] not reasonably available to [trial] counsel." *Ross,* 468 U.S. at 16, 104 S.Ct. at 2910. A claim may be held sufficiently novel when, at the time of its default, the legal tools, *i.e.,* case law, necessary to conceive and argue the claim were not yet in existence and available to counsel. See *Engle v. Isaac,* 456 U.S. 107, 130–33, 102 S.Ct. 1558, 1573–75, 71 L.Ed.2d 783 (1982); *Clanton v. Muncy,* 845 F.2d 1238, 1242 (4th Cir.), *cert. denied,* 485 U.S. 1000, 108 S.Ct. 1459, 99 L.Ed.2d 690 (1988).

■ In holding that Poyner's claim was not novel, the district court relied in large part on the *Ross* Court's statement that

[a]lthough the question whether an attorney has a "reasonable basis" upon which to develop a legal theory may arise in a variety of contexts, we confine our attention to the specific situation presented here: one in which this Court has articulated a constitutional principle that had not been previously recognized but which is held to have retroactive application.

*Ross,* 468 U.S. at 17, 104 S.Ct. at 2911. Thus, in *Ross* the legal argument held to be sufficiently novel so as to excuse a procedural default was one which the United States Supreme Court had later adopted and held to apply retroactively. Certainly the Court has made no such pronounce-ment regarding Poyner's challenge to Virginia's system of appointment of counsel, and the district court, accordingly, held that the claim was not novel.

The precise contours of the novelty exception to the procedural bar doctrine are not as clear as one might hope. In particular, whether a requirement of establishing sufficient novelty under *Ross* is that the legal claim in question must have been subsequently adopted and held retroactive in application by the Supreme Court is unclear. However, in *Carrier,* 477 U.S. at 488, 106 S.Ct. at 2645, the Court referred to *Ross* without noting any such requirement, as did this court in *Clanton,* 845 F.2d at 1242. Though the barriers to the use of novelty as cause for procedural default undoubtedly are high, they may well not include the requirement principally relied upon by the district court,[15] for *Ross* could be considered as the standard as to when the novelty rule would apply, but not as the standard as to when it would not.

The issue of the foregoing requirement aside, we are inclined to agree with the district court's conclusion that this claim is not novel within the meaning of *Ross.* Since the United States Supreme Court's decision in *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), surely no proposition of criminal procedure law has been more clear than that the sixth and fourteenth amendments require that indigent criminal defendants be provided with counsel.[16] Just as importantly, the Commonwealth of Virginia's recognition of the right of an indigent to counsel in a criminal case under the Virginia Constitution far antedates *Gideon* and its progeny. See *Barnes v. Commonwealth,* 92 Va. 794, 803, 23 S.E. 784, 787 (1895); *Watkins v. Commonwealth,* 174 Va. 518, 523, 6 S.E.2d 670, 671 (1940); Code of Virginia § 3518 (1919) (providing for payment of appointed attorneys from public funds). In light of this well-established body of state and fed-

---

**15.** The magistrate's report in rejecting the novelty argument, alternatively relied on the magistrate's finding that this same complaint has been made with respect to Virginia's system of appointment of counsel in at least two other habeas petitions, in the *Waye* case to which we have referred, in both the state circuit court and federal district court.

**16.** See also *Powell v. Alabama,* 287 U.S. 45, 71, 53 S.Ct. 55, 65, 77 L.Ed. 158 (1933).

eral law regarding the necessity of the appointment of competent counsel on behalf of indigent defendants, we would be hard pressed to hold that Poyner's trial counsel was without the legal tools necessary to conceive of and assert this argument.

■ In any event, we need not discuss further *Ross's* novelty exception, as we are confident that Poyner suffered no prejudice under the rule in *Wainwright v. Sykes* by his counsel's failure to object to Virginia's system of appointment of counsel. The prejudice requirement under the procedural bar analysis is significantly greater even than that demanded under the plain error rule. *Carrier*, 477 U.S. at 493–94, 106 S.Ct. at 2648–49. "The habeas petitioner must show 'not merely that the errors at ... trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Carrier*, 477 U.S. at 494, 106 S.Ct. at 2648 (quoting *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 1595, 71 L.Ed.2d 816 (1982) (emphasis in original)). Further, "[s]uch a showing of pervasive prejudice can hardly be thought to constitute anything other than a showing that the prisoner was denied 'fundamental fairness' at trial." *Carrier*, 477 U.S. at 494, 106 S.Ct. at 2648; see also *Felton v. Barnett*, 912 F.2d 92, 97 (4th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 693, 112 L.Ed.2d 683 (1991).

Poyner's allegations of prejudice stemming from the circumstances of the appointment of counsel in preparation for his three trials are exceedingly vague and conclusory. In summary, his argument appears to be that prejudicial delays in the appointment of counsel hampered their ability to investigate in furtherance of his defense and their ability to coordinate his defenses in each of the three trials. As to the Hampton proceeding, Poyner adds that his counsel, though timely appointed by the state general district court, were not reap-

pointed by the state circuit court until some months later. According to Poyner the "uncertainty of eventual appointment" led to a "two-month lack of effort" on the part of his Hampton counsel. Finally, though he apparently does not pursue this argument before this court, in his habeas petition he argued that he was not appointed an attorney until the Monday morning following his Saturday arrest, and that between Saturday and Monday his recollection of the relevant events became confused.

Poyner, however, has utterly failed to direct this or, it appears, any prior court to any evidence that "actual and substantial" prejudice occurred or indeed that he was ever in court without the representation of competent counsel. From the papers before us we can reconstruct the following sequence of events regarding appointment of counsel for Poyner. As we have noted, Poyner was arrested for the murder of Miss Hedrick on February 4, 1984, a Saturday. Immediately upon his arrival at the police station he was advised of and waived his right to counsel. He then appeared before a Virginia Magistrate, who informed him of the charges against him and that he would be held without bond. Following that appearance Poyner again was advised of his right to counsel and he again waived that right. He then confessed to the murders of all five victims.

On Monday, February 6, 1984, a Virginia court appointed Vincent Conway, Esq. to represent Poyner.[17] Conway was replaced on February 14, 1984 by the appointment of Messrs. Richard Blackwell and Kevin Shea, who represented Poyner throughout the Hampton proceedings. On February 16, 1984, Poyner was formally charged with the Newport News murder, at which time James Bradberry, Esq. was appointed to represent him. Bradberry ultimately was replaced by Sharon A. Coles–Stewart, Esq. and Joyce A. Melvin–Jones, Esq. who tried the Newport News case. Finally, Poyner was indicted for the Williamsburg

17. As we have noted, in light of his waiver of the right to counsel following his arrest, that Poyner appeared without counsel before the state magistrate immediately following his arrest itself presents no constitutional violation. See *supra* note 5.

**1426**

murders on March 13, 1984. David Holland, Esq. on the same day was appointed to represent Poyner and thereafter represented him throughout the Williamsburg case.

The foregoing facts reveal that Poyner was never without representation in court after February 6, 1984, the Monday following the Saturday on which he was arrested. Moreover, nothing in the record supports his few specific allegations of prejudice. First, Poyner offers no evidence of the alleged two-month lack of effort; to the contrary, the uncontradicted affidavits and performance of Messrs. Blackwell and Shea, his Hampton counsel, prove otherwise. Second, the undisputed affidavits of trial counsel from each proceeding refute Poyner's assertion that the three groups of counsel did not consult with each other on matters of trial strategy and the like. Third, it is apparent that each state court provided Poyner with appointed counsel from the moment he was first called before that court.

Finally, the record as a whole belies any general assertion that Poyner's defense was impeded in any way by the sequence in which his counsel was appointed. Here we emphasize that we have considered and rejected the ineffective assistance of counsel claims that Poyner has brought attacking his counsel's performance in every significant aspect of his trials. We simply have found that Poyner's trial counsel rendered constitutionally sufficient representation in every respect. In light of Poyner's inability to point to any specific instance of prejudice, we hold that he suffered no prejudice, especially within the meaning of *Wainwright v. Sykes*, from the circumstances of the appointment of his counsel, and that the procedural bar of that claim cannot be excused.

The judgments of the district court are accordingly affirmed in the following cases which are all of the cases with respect to Poyner and the death sentences awarded to

him under consideration herein: No. 91–4001, No. 91–4002, No. 91–4003, No. 91–4004, No. 91–4005, No. 91–4006.[18]

*AFFIRMED.*

---

**18.** There are in reality only three cases. The six case numbers are accounted for by the fact that two notices of appeal were filed in each case, the first following the orders of the district court denying habeas corpus relief, and the second following the district court's refusal to grant post-judgment relief.